

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Francisco J. Orsini García<br><br>    Recurrido<br><br>         v.<br><br>Juan C. Méndez, Secretario de Hacienda, Estado Libre Asociado de Puerto Rico<br><br>    Peticionarios | Certiorari<br><br>2009 TSPR 190<br><br>177 DPR \_\_\_\_ |

Número del Caso: AC-2007-100

Fecha: 18 de diciembre de 2009

Tribunal de Apelaciones:

      Región Judicial de San Juan, Panel III

Juez Ponente:
          Hon. José A. Morales Rodríguez

Oficina del Procurador General:

          Lcda. Karla Pacheco Álvarez
          Procuradora General Auxiliar

Abogado de la Parte Recurrida:

          Lcdo. Miguel A. Rodriguez Suarez

Materia: Contribución Sobre Ingresos

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Franciso J. Orsini García
        Recurrido

             v.

Juan C. Méndez, Secretario
de Hacienda, Estado Libre              AC-2007-100
Asociado de Puerto Rico
        Peticionarios

Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta

En San Juan, Puerto Rico a 18 de diciembre de 2009.

La controversia que este Tribunal debe atender se circunscribe a dos cuestionamientos principales: Primero, si la indemnización condicionada a un denominado Acuerdo de Relevo, que la compañía Pfizer, Inc. le otorgó al señor Francisco J. Orsini García al separarlo de su empleo, está exenta del pago de contribuciones y, segundo, si esta compensación puede ser clasificada como "mesada". A continuación se exponen los hechos pertinentes a la controversia.

**I.**

Luego de 18 años de servicios para la compañía farmacéutica Pfizer, el señor Orsini García fue

separado de su empleo el 20 de octubre del 2003. Como parte del proceso de despido, Pfizer le ofreció al señor Orsini García una indemnización a cambio de que éste firmara un documento titulado "Acuerdo de Relevo". En este escrito, el señor Orsini García relevaba a Pfizer de cualquier reclamación, conocida o por conocer, que estuviera relacionada con su empleo y la terminación del mismo. Concretamente, el acuerdo imposibilitaba que el señor Orsini García pudiera presentar ante la judicatura del país alguna reclamación relacionada con leyes laborales locales o federales.

El mismo día del despido, el señor Orsini García firmó el acuerdo y Pfizer le otorgó la compensación de $163,323.66, no sin antes descontarle $32,345 correspondientes a la partida de contribución sobre ingresos. Para el año fiscal 2003-2004, el señor Orsini García presentó sus planillas de contribución sobre ingreso e incluyó en ellas la partida de $163,323.66. El 13 de septiembre de 2004, el señor Orsini García sometió una planilla enmendada, en la cual eliminó dicha partida y determinó una contribución total de $33,479. Además, le solicitó al Departamento de Hacienda que le reintegrara la cantidad de $32,345 descontada por Pfizer por considerar que correspondía a una contribución pagada en exceso. Su petición la sustentó en que los $163,323.66 no constituían salarios y, por lo tanto, no eran tributables. Por eso, la

retención en el origen que había realizado el patrono Pfizer, por la suma de $32,345, era improcedente.

La Oficina de Apelación Administrativa del Departamento de Hacienda no atendió la solicitud de reintegro del señor Orsini García, sino que el 22 de agosto de 2006 emitió una Notificación Final de Deficiencia Administrativa en la cual expuso lo siguiente: "… el caso de epígrafe ha sido resuelto según se demuestra en los anejos que se acompañan…"[1]. Por esta razón, el señor Orsini García presentó una demanda ante el Tribunal de Primera Instancia el 19 de septiembre del 2006. En ésta, argumentó que la compensación de $163,323.66 que le había conferido Pfizer, producto de la firma del acuerdo, no constituía salario, no equivalía a remuneración por labores o servicios prestados ni tampoco era un sustituto de sueldo. En vez, se trataba de una indemnización por daños y perjuicios, a causa de la violación por Pfizer de varias leyes laborales. Bajo esta premisa, el señor Orsini García planteó que no se requería pagar contribuciones por este tipo de indemnización.

Por su parte, el Sr. Juan C. Méndez, Secretario de Hacienda, representado por el Procurador General, le solicitó al foro de instancia que desestimara la controversia. Adujo que el pago recibido por el señor Orsini García no era una indemnización bajo la Ley Núm. 80 del 30 de mayo de 1976, supra, sino una compensación por

---

[1] Véase: Apéndice III (1) del Procurador General, Notificación Final de la Deficiencia, pág. 82.

cesantía, por lo que constituía un ingreso tributable. El 27 de agosto del 2007, notificada el 6 de septiembre del 2007, el tribunal de instancia desestimó el caso y determinó que la compensación económica recibida por el señor Orsini García era tributable porque era producto de un contrato de transacción en el cual se concedió un relevo de responsabilidad a favor de la compañía Pfizer. Concluyó que no se trataba de una compensación por concepto de una lesión personal o enfermedad y mucho menos una indemnización por daños y perjuicios al amparo del artículo 1802 del Código Civil.

El señor Orsini García recurrió entonces ante el Tribunal de Apelaciones. El 29 de noviembre del 2007, el foro apelativo emitió su sentencia, notificada el 5 de diciembre del 2007, y revocó la determinación del Tribunal de Primera Instancia. Específicamente, el tribunal apelativo ordenó al Secretario de Hacienda que reembolsara la contribución que el señor Orsini García había pagado por la compensación que había recibido en ocasión de su despido. Entendió el tribunal que las enmiendas realizadas a la Ley Núm. 80 del 30 de mayo de 1976, supra, y al Código de Rentas Internas, según las cuales no se retendrá en el origen la porción correspondiente al pago de contribuciones sobre el dinero recibido por concepto de despido injustificado, implicaban necesariamente que esta compensación está exenta del pago de tributo.

Inconforme, el 27 de diciembre del 2007 el Secretario de Hacienda presentó un recurso de apelación, el cual acogimos como *certiorari*. En ese recurso, el Procurador General plantea que el Tribunal de Apelaciones erró al resolver que la compensación concedida a un empleado por razón de su despido no es tributable. Considera que el foro apelativo sustituyó el criterio del Legislador en cuanto a las exenciones contributivas y desatendió la norma de deferencia que impera en la interpretación de las leyes tributarias que hace el Secretario de Hacienda, así como la norma de interpretación restrictiva de las leyes fiscales. El señor Orsini García sometió su alegato en oposición el 15 de julio del 2008. Considerada la posición de ambas partes, procedemos a resolver.

## II.

### A. El Criterio de interpretación aplicable

Nuestro ordenamiento positivo está conformado por una diversidad de normas jurídicas. Por un lado, se encuentran las normas generales o estatutarias, entre las cuales se incluyen los reglamentos y, claro está, la Constitución, que es nuestra ley suprema. Por otro lado, están las normas particulares establecidas en los negocios jurídicos y, finalmente, las normas individualizadas que surgen como resultado de las sentencias que dictan los tribunales.[2]

---

[2] L. R. Siches, Introducción al Estudio del Derecho, 3ra Edición, Editorial Porrúa, S. A., México, 1974, pág. 213; B. De Castro Cid, La Filosofía Jurídica de Luis Recasens Siches, Universidad de Salamanca, España, 1974, págs. 217-218.

La Asamblea Legislativa tiene la encomienda constitucional de crear la normativa estatutaria de nuestro país. De ordinario, estos estatutos son elaborados en forma general, amplia y abstracta, aunque surgen para atender situaciones y problemas concretos relacionados al desarrollo económico, social, cultural, académico y político de nuestra sociedad en una época histórica en particular.

Esto implica que una vez la Legislatura cumple con su misión de crear leyes, los tribunales asumen su deber, también constitucional, de transformar los términos abstractos en preceptos concretos, palpables e individualizados. En este proceso, los magistrados tienen la encomienda de dilucidar el significado del estatuto y hacer valer la voluntad legislativa. Para cumplir este objetivo, hemos señalado que se debe "penetrar la superficie verbal del problema, precisar el diseño y la razón de ser de las disposiciones legales, sopesar los intereses en juego, para intentar acercarnos a la interpretación más justiciera."[3] En este sentido es que Recaséns Siches propone que el único método de interpretación jurídica debe ser "la lógica de lo razonable

---

[3] <u>Pueblo v. Negrón Caldero</u>, 157 D.P.R. 413, 423 (2002); <u>Sucn. Álvarez v. Srio. de Justicia</u>, 150 D.P.R. 252, 275 (2000); <u>Pueblo v. Tribunal Superior</u>, 104 D.P.R. 363, 366 (1975).

o de lo humano"[4].  Como proceso lógico al fin, responde a

criterios objetivos, según explica De Castro Cid:

> Se sostiene que el juez, al determinar cuál sea la norma aplicable al caso singular, se debe atener a criterios objetivos, criterios que son, ante todo, las valoraciones que inspiran al orden jurídico positivo en su totalidad, es decir, tomando en cuenta no sólo los textos legales y reglamentarios sino atendiendo también a las valoraciones en que se basa ese orden jurídico positivo en un determinado momento y a los efectos prácticos que dichas valoraciones deben producir sobre el caso concreto.  Esos criterios son, además las convicciones sociales vigentes precisamente en el presente, las cuales condicionan, circunscriben e impregnan el orden jurídico positivo.  Entre esos criterios figura asimismo la idea de que los requerimientos de justicia se tienen en la sociedad y en la época concreta en que se vive.  Y todos esos criterios son objetivos, tan objetivos como lo pueden ser los textos legales y reglamentarios.[5]

A fin de cuentas, pues, nadie puede comprender e

interpretar la significación de cualquier legislación con

la mera lectura de su texto, sin conocer el contexto

histórico, cultural y social en el cual se aprobó.  Se

requiere entonces incluir en el análisis no tan solo los

elementos intrínsecos a la legislación, como son su

exposición de motivos o sección de definiciones, sino

también ciertos factores extrínsecos a la misma.  Entre

éstos los tratadistas destacan: "(1) los sucesos o puntos

de vistas contemporáneos a su aprobación; (2) la política y

el orden público; (3) los informes de la Comisión

---

[4] L. Recasens Siches, _Nueva Filosofía de la Interpretación del Derecho_, 2da Edición, Editorial Porrúa, México, 1973, págs. 131-187; Véase, además, B. De Castro Cid, _op.cit._, pág. 248, citando a Recaséns Siches.

[5] B. De Castro Cid, _op.cit._, pág. 249.  Véase, además, L. Recasens Siches, _Íd_, pág. 40.

Legislativa que estudió el proyecto de ley; (4) el Diario de Sesiones, los anteproyectos, en fin el historial legislativo; (5) la historia de la ley; (6) el momento de la aprobación de ésta; (7) las realidades sociales, políticas y económicas en el momento de hacerse la interpretación y (8) las condiciones existentes y las costumbres arraigadas al momento de aprobarse la ley."[6] También sirven, según explica Fiore: "la comparación de las leyes, de la doctrina y de la jurisprudencia."[7]

Hemos reconocido que el sentido común de los jueces es otro factor extrínseco que éstos pueden utilizar para descifrar la intención legislativa de los estatutos. No hay regla de hermenéutica alguna que lo impida,[8] puesto que las acciones de los foros judiciales, incluso la interpretación del texto de una ley, deben siempre responder al objetivo de hacer prevalecer la verdadera justicia.[9]

---

[6] R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de Leyes en Puerto Rico, Segunda Edición Revisada, Publicaciones J.T.S., 1987, Vol. 1, págs. 242-243, 369-386.

[7] P. Fiore, De la Irretroactividad e Interpretación de las Leyes: Estudio Crítico y de Legislación Comparada, 3ra Edición, Madrid, España, Editorial Reus (S.A.), 1927, pág. 578.

[8] Álvarez & Pascual, Inc. v. Srio. de Hacienda, 84 D.P.R. 482, 491 (1962), basándose en las siguientes fuentes: Roschen v. Ward, 279 U. S. 337, 339 (Holmes) (1929); 73 L. ed. 722, 728; Frankfurter, "Some Reflections on the Reading of Statutes", 47 Columbia Law Review 527 y ss (1947).

[9] Encarnación v. Jordán, 78 D.P.R. 505, 519 (1955). Al utilizar estos elementos extrínsecos, se persigue otorgar al estatuto un contenido no tan solo literal sino también lógico a la voluntad legislativa. A este tipo de operación

Este Tribunal constantemente ha validado el tipo de interpretación que tiene como finalidad identificar los propósitos que persigue una ley, de forma tal que ésta se ajuste a la política pública que la inspira.[10] A este tenor hemos expresado, enfáticamente, que "las leyes hay que interpretarlas y aplicarlas en comunión con el propósito social que las inspira, sin desvincularlas de la realidad y del problema humano que persiguen resolver".[11] Todo para evitar que una interpretación literal lleve a resultados absurdos.[12] Además, según explica Ihering, "el fin es el

---

de hermenéutica se le denomina construcción o interpretación extensiva. Sobre este método de interpretación, los tratadistas Bernier y Cuevas Segarra explican lo siguiente:

> En la construcción extensiva se usa el procedimiento de comparar las cosas previstas por la ley con otras no comprendidas en su letra, pero que resultaría absurdo no incluir en ella. También el de proyectar la interpretación a otras situaciones de razón mayor o de más fuerza, en que los motivos que haya tenido el legislador para aprobar determinada legislación serían más evidentes que en los casos que el legislador previó expresamente en la ley. R. E. Bernier y J.A. Cuevas Segarra, *op.cit.*, pág. 263.

[10] Corp. Difusión Pública v. C.E.E., 2007 T.S.P.R. 231; Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155, 163 (2000); Piñero v. A.A.A., 146 D.P.R. 890, 898 (1998); Dorante v. Wrangler, 145 D.P.R. 408, 417 (1998); Col. Ópticos P.R. v. Pearl Vision Center, 142 D.P.R. 221, 228 (1997); J.R.T. v. A.E.E., 133 D.P.R. 1, 9 (1993); Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 749 (1992); Vázquez v. A.R.P.E., 128 D.P.R. 513, 523 (1991); García Pagán v. Shiley Caribbean, et al., 122 D.P.R. 193, 208 (1988).

[11] Matos v. Junta Examinadora, 165 D.P.R. 741, 748 (2005); Piñero v. A.A.A., *Íd*; Col. Ópticos P.R. v. Pearl Vision Center, *Íd*; Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735, 756 (1992); Vázquez v. A.R.P.E., *Íd*; García Pagán v. Shiley Caribbean, Etc., *Íd*.

[12] Rodríguez v. Syntex, 160 D.P.R. 364, 383 (2003); P.R.T.Co. v. J. Reg. Tel. de P.R., 151 D.P.R. 269, 285

creador de todo [d]erecho" y "no hay norma jurídica que no deba su origen a un fin, a un propósito, esto es, a un motivo práctico."[13]

Los estatutos se interpretan distintamente de acuerdo a la razón por la cual fueron creados. Si el objetivo legislativo es beneficiar a los individuos, al Estado o reparar alguna situación de injusticia en particular, la interpretación deberá ser liberal. Por el contrario, si el objetivo está dirigido a limitar los derechos del Estado o de la sociedad en general, la interpretación debe ser restrictiva. La idea de estas formas de interpretación es facilitar que se cumpla la finalidad de cada legislación.

Ahora, la presente controversia nos obliga a cuestionarnos qué tipo de interpretación, restrictiva o liberal, prevalecerá cuando están en contraposición una legislación que beneficia a la sociedad, en específico a la masa trabajadora, y otra que favorece al Estado. En concreto: ¿cómo armonizamos la finalidad legislativa de la Ley de Contribución sobre Ingresos de 1994, que persigue favorecer al Estado interpretando de forma amplia el concepto ingreso[14] y restrictivamente el derecho de los

---

(2000); Zambrana Maldonado v. ELA, *supra*; Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 409 (1988).

[13] Citado en L. Recasens Siches, *op.cit.*, pág. 41; Véase, también, E. Pedro Haba, El Espejismo de la Interpretación Literal: Encrucijadas del Lenguaje Jurídico, Tomo I, 1era Edición, San José, C. R.: Corte Suprema de Justicia, Escuela Judicial, 2003, págs. 69-70.

[14] San Juan Trading Co. v. Srio de Hacienda, 80 D.P.R. 807, 816 (1958); Flax v. Tesorero, 76 D.P.R. 390, 395 (1954).

contribuyentes a las exclusiones sobre esta partida, con la interpretación flexible de las leyes laborales, como por ejemplo, aquella relacionada a la indemnización por despido, que siempre son en beneficio de la parte más débil, es decir, de los trabajadores?  Se trata de conciliar la política fiscal del país, que está dirigida a obtener más ingresos para sus arcas, con la premisa de que las indemnizaciones por despido y otras indemnizaciones otorgadas por los patronos en cumplimiento de alguna ley laboral, tienen el objetivo de reparar el daño ocasionado al obrero por acciones discriminatorias del patrono o por la pérdida del empleo.

La legislación laboral de Puerto Rico está orientada a promover la justicia social de la clase trabajadora, garantizando la mayor protección de sus derechos laborales.[15]  Su esencia es remedial o reparadora, por lo cual su interpretación judicial debe ser liberal y amplia para que se puedan alcanzar los objetivos que la originaron.[16]  En este proceso interpretativo, toda duda en

---

[15] Adventist Health v. Mercado, 2007 T.S.P.R. 100, 2007 J.T.S. 106, 171 D.P.R. ___ (2007); Cintrón v. Ritz Carlton, 162 D.P.R. 32, 39 (2004).

[16] Arce Buceta v. Motorola Electrónica de PR, Inc y otros, 2008 T.S.P.R. 59; Adventist Health v. Mercado, Íd; Torres v. Gobierno de Coamo, 2007 T.S.P.R. 46, 2007 J.T.S. 51, 170 D.P.R. ___ (2007); Muñiz Hernández v. Policía de Puerto Rico, 134 D.P.R. 486, 496-497 (1993); Martínez Reyes v. Tribunal Superior, 104 D.P.R. 407, 411 (1975). Véase, además, R. Elfren Bernier y otros, op.cit., pág. 455; C. Zeno Santiago y V. Bermúdez, Tratado del Derecho del Trabajo, San Juan, Puerto Rico, Publicaciones JTS, 2003, Tomo I, págs. 27, 94; R. N. Delgado Zayas, Apunte para el Estudio de la Legislación Protectora del Trabajo en el

cuanto a la aplicación de una disposición legal laboral deberá resolverse a favor del empleado.[17]

Contrariamente, los estatutos contributivos relacionados con las exclusiones del ingreso bruto se interpretan restrictivamente.[18] Esta doctrina de interpretación, según el licenciado Meléndez Carrucini, está sustentada en dos principios fundamentales:

> Primero, el que propone que el legislador, al tributar los ingresos, tuvo el propósito deliberado de hacerlo en su sentido amplio y abarcador…
> Segundo, las exclusiones del ingreso bruto requieren de una disposición estatutaria específica que las conceda.[19]

Esta regla de interpretación estricta de las exenciones contributivas se fundamenta, a su vez, en que éstas son privilegios excepcionales que concede el Estado y toda duda sobre su existencia debe resolverse en su contra.[20] Por lo tanto, para conceder una exención

---

Derecho Laboral Puertorriqueño, San Juan, Puerto Rico, Ramallo Bros. Printing, Inc., 2005, pág. 15.

[17] Arce Buceta v. Motorola Electrónica de PR, Inc y otros, supra; Adventist Health v. Mercado, supra; Torres v. Gobierno de Coamo, supra; García v. A.E.E.L.A., 2007 T.S.P.R. 29, 2007 J.T.S. 34, 170 D.P.R. ____(2007) ; Jiménez v. General, 2007 T.S.P.R. 13, 2007 J.T.S. 18, 170 D.P.R. ____ (2007); Piñero v. A.A.A., supra, págs. 901-902.

[18] PARDAVCO, Inc. v. Srio. de Hacienda, 104 D.P.R. 65, 73 (1975); Publio Díaz v. E.L.A., 106 D.P.R. 854, 870 (1978); Central Aguirre Sugar v. Srio. de Hacienda, 91 D.P.R. 340, 347 (1964).

[19] G. Meléndez Carrucini, Ingreso No Tributable: Exclusiones y Doctrinas, 1ra Edición, Instituto de Contribuciones de Puerto Rico, Inc., San Juan, Puerto Rico, 1994, pág. 57-58.

[20] Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 559-560 (2001); Lever Bros. Export Corp. v. Alcalde de S. J.,

contributiva, ésta debe existir concretamente, no puede ser inferida.[21]

Sin embargo, hay que tener presente que estas reglas de interpretación estricta deben armonizarse con la otra regla que señala que las leyes que imponen contribuciones, al igual que toda legislación, deben recibir una interpretación razonable, tendiente a llevar a efecto el propósito y la intención del legislador.[22] En otras palabras, las exenciones contributivas no se interpretarán restrictivamente si la intención legislativa de conceder las mismas es clara e inequívoca, pues ello derrotaría el propósito del estatuto.[23]

Más concretamente, Meléndez Carrucini argumenta que "el uso de la doctrina de la interpretación restrictiva de las exenciones como un principio dogmático y aforístico arriba con frecuencia a conclusiones que no encuentran verdadero apoyo en el texto de la ley, ni en su historial y su intención."[24] Hemos validado esta perspectiva al

---

140 D.P.R. 152, 161-162 (1996); Berwind Lines, Inc. v. Srio. de Hacienda, 113 D.P.R. 658, 660 (1982).

[21] San Juan Trading Co. v. Srio. de Hacienda, *supra*, pág. 815; Rivera v. Registrador, 74 D.P.R. 127, 143 (1952); Sucn. Pedro Giusti v. Tribunal de Contribuciones, 70 D.P.R. 117, 121 (1949).

[22] Roque González & Co. v. Srio. de Hacienda, 127 D.P.R. 842, 856-857 (1991); Industria Lechera v. Srio. de Hacienda, 95 D.P.R. 839, 842 (1968); Licorería Trigo, Inc., v. Srio. de Hacienda, 94 D.P.R. 270, 279 (1967).

[23] G. Meléndez Carrucini, Ingreso No Tributable: Exclusiones y Doctrinas, *op.cit.*, pág. 23.

[24] G. Meléndez Carrucini, Ingreso No Tributable: Exclusiones y Doctrinas, *Íd.*, pág. 73.

resolver que un tribunal no debe interpretar la legislación contributiva en forma extensiva, sino que debe interpretarla en forma justa, a tenor con sus propios y expresos términos.[25] Esto implica que si el propósito de imponer contribuciones no es claro, la duda deberá resolverse en contra de su imposición.[26]

En el caso ante nuestra consideración, no está claro si la Ley excluye del ingreso bruto la indemnización que se otorga para reparar el daño ocasionado por el despido, sea ésta concedida como parte de una obligación contractual, es decir, la transacción o la compensación por cesantía ("severance payments") o legal, como lo es la mesada y la indemnización progresiva. Esta exclusión no está expresamente establecida en la Ley de Contribuciones por Ingresos de 1994.

Sin embargo, si por esa sola razón aplicamos la regla general de interpretación restrictiva de las exenciones, de forma automática y literal, para concluir que la indemnización por despido es tributable, nos apartamos de la interpretación liberal que siempre le hemos concedido a la legislación obrera. Acogemos, en vez, la pauta

---

[25] BBC Realty v. Secretario Hacienda, 166 D.P.R. 498, 508 (2005); Café Rico, Inc. v. Mun. de Mayagüez, *supra*, pág. 559. Continental Ins. Co. v. Srio. de Hacienda, 154 D.P.R. 146, 157-158 (2001); Tallcott Inter-Amer. Corp. v. Registrador, 104 D.P.R. 254, 262 (1975).

[26] BBC Realty Inc., v. Secretario Hacienda, *Íd*, pág. 507; Central Aguirre Sugar v. Srio. de Hacienda, *supra*, 348 (1964); Central Coloso v. Descartes, Tes., 74 D.P.R. 481, 486 (1953).

hermeneútica de realizar una interpretación razonable que nos permita descifrar la finalidad del estatuto contributivo. Sobre este asunto abundaremos en la parte C de esta opinión.

**B. La protección del empleo y las modalidades indemnizatorias del despido**

Los contratos de trabajo son la forma de contratación pertinente a las relaciones sociales que se establecen entre el que emplea y el que es empleado para realizar un trabajo o servicio. Más técnicamente, se trata del contrato "que tiene por objeto la prestación continuada de servicios privados y con carácter económico, y por el cual una de las partes-el patrono, empresario o empleador-da remuneración o compensa a cambio de disfrutar o servirse, bajo su dependencia o dirección, de la actividad profesional de otra, denominada el trabajador."[27]

Al contrato de trabajo siempre se le ha visualizado como un típico contrato de adhesión.[28] Esto debido a que el patrono es quien unilateralmente elabora las disposiciones del contrato, mientras que la única función del empleado es aceptar lo que se le propone porque no tiene la posibilidad de exigir mejores términos. Puesto que se trata de una

---

[27] G. Caballenas de Torres, Diccionario de Derecho Laboral, Editorial Heliasta S. R. L., Argentina, 2001, págs. 139-140; Véase, además, Soc. de Ganaciales v. Vélez & Asoc., 145 D.P.R. 508, 517 (1998).

[28] Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 166 (nota 9) (1994); Santiago v. Kodak Caribbean, Ltd., 129 DPR 763, 776 (1992).

relación en la que el trabajador es la parte más débil, el Estado se ha encargado de aprobar una variedad de leyes protectoras del trabajo cuya finalidad es proteger el empleo, regular el contrato de trabajo y asegurar la salud y seguridad del obrero.[29] Entre la legislación relativa a la protección del empleo se encuentra la que se encarga de reglamentar el despido.

Frente al despido, que es una de las formas de extinguir el contrato de trabajo, debemos ponderar dos intereses disímiles; por un lado, el interés del empleado en conservar su trabajo y, por el otro, el derecho que tiene el patrono de determinar cuáles recursos, humanos y materiales, formarán parte de su negocio. De esta realidad, en la que se confrontan dos fuerzas, una dirigida a proteger la permanencia de la relación obrero y empleador y otra a flexibilizar la ruptura del contrato de trabajo, surge la necesidad de intervención estatal para lograr la estabilidad del empleo.

Entre los estudiosos del Derecho Laboral hay distintas teorías sobre la estabilidad del empleo. Unos se suscriben a una concepción amplia de la estabilidad del contrato de trabajo, la cual persigue que el trabajador pueda permanecer en su empleo hasta el momento de su jubilación. Esta perspectiva es consistente con la atribución al trabajador de un derecho propietario sobre el empleo. Mientras, la concepción estrecha de la estabilidad, cuyo

---

[29] Véase: R. Delgado Zayas, *op.cit.*, pág. 4.

enfoque es más conservador, lo que busca es controlar o frenar el despido, de forma que éste sólo se efectúe ante una causa prevista expresamente en la ley.[30] Indistintamente de la noción de estabilidad del empleo aplicable, es necesario establecer que la finalidad de cada una de éstas es proteger a los empleados de los despidos injustificados o arbitrarios.[31]

En Puerto Rico coexisten estatutos que responden a ambas visiones sobre la estabilidad en el empleo. Por un lado, se encuentra la legislación laboral que proscribe el despido y autoriza que el trabajador sea reinstalado en su empleo, la cual responde a una concepción amplia.[32] Por otro lado, tenemos aquella legislación que reglamenta el despido injustificado, cuando éste no está prohibido, y concede como remedio único una indemnización económica sin posibilidad de reinstalación. Esta puede ser ubicada en una concepción estrecha de la estabilidad. Sobre esta

---

[30] C. Reynoso Castillo, _El Despido Individual en América Latina_, Universidad Nacional Autónoma de México Ciudad Universitaria, México D. F., 1990, págs. 92-94.

[31] C. Reynoso Castillo, _Íd_, pág. 95; V. H. Álvarez Chávez, _Regímenes Indemnizatorios del Despido: Teoría y Práctica_, Editorial Ábaco de Rodolfo de Depalma, Buenos Aires, Argentina, 1988, pág. 36.

[32] Algunas de estas leyes son: Ley Núm. 100 de 30 de junio de 1959, según enmendada, Ley contra el Discrimen en el Empleo; Ley Núm. 17 de 22 de abril de 1988, Ley para Prohibir el Hostigamiento Sexual en el Empleo; Ley Núm. 3 de 13 de marzo de 1942, según enmendada, Ley de Discrimen contra la Mujer Embarazada; Ley Núm. 115 de 20 de diciembre de 1991, Ley de Represalias en el Empleo; entre otras. Para un mayor desglose de este tipo de leyes, véase: R. N. Delgado Zayas, _op. cit._, págs. 112-114.

normativa es que debemos centrar nuestra atención para resolver la presente controversia.

Nuestra normativa laboral sobre despido injustificado sólo es aplicable a los empleados del sector privado. Su evolución histórica tuvo sus inicios en el Código de Comercio de 1886, posteriormente derogado, donde se reconoció, por primera vez, aunque de forma limitada, el derecho de un empleado a ser indemnizado cuando su patrono lo despedía injustificadamente. Este estatuto proveía para que todo patrono que despidiera sin justa causa a un empleado de comercio, tuviera que pagarle una compensación por despido.[33]

Estos derechos se hicieron extensivos a todos los empleados, a través de la Ley Núm. 43 de 28 de abril de 1930.[34] Posteriormente, la Ley Núm. 50 de 20 de abril de 1949 mantuvo el esquema de la indemnización como remedio

---

[33] R. N. Delgado Zayas, *Íd*, pág. 110; Artículo 220, Código de Comercio de Puerto Rico de 1 de mayo de 1886, Compilación de los Estatutos Revisados y Códigos de Puerto Rico, Negociado de Materiales, Imprenta y Transporte, San Juan, Puerto Rico, 1941, pág. 916. Véase, además, Departamento del Trabajo y Recursos Humanos, Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80, Aprobada el 30 de mayo de 1976, según enmendada, 2000, págs. 2-3.

[34] Enmendada por la Ley Núm. 84 de 12 de mayo de 1943, a los efectos de "establecer el derecho del trabajador contratado sin término fijo que fuere despedido sin justa causa a recibir de su patrono una suma correspondiente a un mes de sueldo, en lugar de una suma que se hacía depender de los términos de pago al trabajador, como lo disponía anteriormente la Ley Núm. 43". Departamento del Trabajo y Recursos Humanos, *Íd*, pág. 4.

único por despido injustificado.[35]  Además, se convirtió en
el estatuto general de despido del país porque su
aplicación se extendió a todos los empleados, incluyendo a
los del área comercial, al derogar, no tan solo las leyes
precursoras, sino  la norma sobre despido injustificado
establecida en el Código de Comercio.[36]

La actual normativa de despido, contenida en la Ley
Núm. 80 del 30 de mayo de 1976, según enmendada[37], sólo
aplica a aquellos empleados de comercio, industria o
cualquier otro negocio o sitio de empleo que: (1) están
contratados sin tiempo determinado; (2) reciben una
remuneración; y (3) son despedidos de su cargo, sin que
haya mediado una justa causa.[38]  Esta ley, igual que sus

---

[35] Long Corp. v. Tribunal de Distrito, 72 D.P.R. 788 (1951).

[36] Ley Núm. 50 de 20 de abril de 1949, Artículo 1, Leyes de
la Primera Legislatura Ordinaria de la Decimoséptima
Asamblea Legislativa de Puerto Rico, Administración General
de Suministros, San Juan, Puerto Rico, 1949, pág. 127.
Véase, además, Luis Sánchez Caso, "Reflexiones sobre la
responsabilidad civil de los oficiales y gerenciales en
reclamaciones de despido o discrimen", 39 Rev. Jur.
U.I.P.R., Agosto-Diciembre, 2004, pág. 245 y Departamento
del Trabajo y Recursos Humanos, op.cit., pág. 4.  Otra
contribución de este estatuto fue eliminar el requisito del
preaviso y uniformar la compensación a un mes de sueldo.

[37] La Ley 80 ha sido enmendada, además, por los siguientes
estatutos: la Ley Núm. 128 de 7 de octubre de 2005; la Ley
Núm. 306 de 23 de diciembre de 1998; la Ley Núm. 234 del 17
de septiembre de 1996; la Ley Núm. 45 del 6 de agosto de
1991, la Ley Núm. 115 del 20 de diciembre de 1991; la Ley
Núm. 7 del 1 de marzo de 1988; la  Ley Núm. 9 del 3 de
octubre de 1986; la Ley Núm. 65 del 3 de julio de 1986; la
Ley Núm. 146 del 18 de julio de 1986; la Ley Núm. 67 de 3
de julio de 1986 y la Ley Núm. 16 del 21 de mayo de 1982.

[38] Artículo 1, Ley 80, supra, 29 L.P.R.A. sec. 185a.
(Suplemento 2008); García v. Aljoma, 162 D.P.R. 572, 585
(2004); Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364, 375
(2001).

estatutos predecesores, no prohíbe de forma absoluta el despido de los empleados.[39]

No obstante, esta legislación protectora del trabajo mantiene los valores de la legislación que le precede porque se enfoca en regular las relaciones obrero-patronales, proteger el derecho del trabajador a la tenencia de su empleo y evitar o desalentar las prácticas de despido injustificado.[40] Concretamente, el estatuto persigue que:

> …se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo mediante la aprobación de una ley que a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado desaliente la incidencia de este tipo de despido.[41]

Para alcanzar este objetivo, la Asamblea Legislativa definió la justa causa como aquella que está vinculada al buen y normal funcionamiento de la empresa[42] y aumentó la

---

[39] Santiago v. Kodak Caribbean, LTD., *supra*, pág. 775; Ruy N. Delgado Zayas, Apuntes para el Estudio de la Legislación Protectora del Trabajo en el Derecho Laboral Puertorriqueño, Ramallo Bros. Printing, Inc., San Juan, Puerto Rico, 2001, pág. 115; Véase, además, Luis H. Sánchez Caso, "Reflexiones sobre la Responsabilidad Civil de los Oficiales y Gerenciales en Reclamaciones de Despido o Discrimen", 34 Rev. Jur. U.I.P.R. 183, 210-11 (2000).

[40] Díaz v. Wyndham Hotel Corp., *supra*, pág. 374; Véase: R. Delgado Zayas, *Íd.*, págs. 127-128 y Charles Zeno Santiago y Víctor M. Bermúdez Pérez, Tratado de Derecho del Trabajo, Puerto Rico, Publicaciones J.T.S., 2003, Tomo I, pág. 35.

[41] Exposición de Motivos de la Ley Núm. 80 de 1976, según enmendada.

[42] Artículo 2, Ley Núm. 80 de 1976; 29 L.P.R.A. sec. 185(b); Srio. del Trabajo v. G. P. Inds., Inc., 153 D.P.R. 223, 242 (2001). Jusino et als. v. Walgreens, 155 D.P.R. 560, 573

compensación por despido injustificado al incluir, además del pago de la mesada representativa de un mes de sueldo, "una indemnización progresiva equivalente a una semana por cada año de servicio."[43]  De esta forma, el estatuto evita que un patrono despida a un empleado sin causa justificada; le impone al patrono responsabilidad económica por despedir sin justa causa a un empleado y le provee al trabajador una indemnización que le permita subsistir, mientras encuentra un nuevo empleo.

Más recientemente, a través de la Ley Núm. 234 de 17 de septiembre de 1996, que enmienda a la Ley Núm. 80 de 1976, se aumentó la indemnización por despido correspondiente a la mesada.  El aumento se estableció mediante un pago escalonado de sueldo, de uno a tres meses, de acuerdo a los años de servicio del empleado en la compañía.[44]  Además, en el 2005 se duplicó el pago de la mesada y se estableció un pago escalonado, según los años de servicio, por concepto de la indemnización progresiva.[45]

Esta política pública, dirigida a desalentar los despidos injustificados, se sustenta en que sin la protección del empleo no son necesarios otros derechos

_____

(2001); Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643, 650 (1994).

[43] Artículo 1, supra; 29 L.P.R.A. sec. 185(a) (b).

[44] 29 L.P.R.A. 185a (2002).

[45] Historial Legislativo, P. de la C. 631, Ley Núm. 128 de 7 de octubre de 2005, 29 L.P.R.A. sec. 185a (Suplemento 2008). Esta enmienda no aplica a nuestra controversia porque los hechos de este caso sucedieron durante el año 2003.

laborales, que por definición requieren una relación de trabajo, y claro, en que el trabajo tiene una función social trascendental tanto en el ámbito individual como en el colectivo. A esta realidad responde nuestra afirmación de que "el trabajo tiene un hondo significado ético, porque mediante el mismo la persona aporta al bien común y se realiza a sí misma."[46]

Como es patente, el patrono tiene una obligación legal de pagarle una indemnización al obrero que es despedido injustificadamente. Esa es su penalidad por despedir a un obrero sin justa causa. La finalidad de este tipo de compensación se puede analizar desde dos perspectivas. Por un lado, la indemnización por mesada tiene el propósito de compensar el daño causado al obrero al habérsele despojado del modo de subsistencia. En ese sentido, la indemnización por mesada sustituye la pérdida del empleo. Mientras, la indemnización progresiva, que también se recibe en sustitución del empleo, tiene el doble objetivo de reconocer el tiempo dedicado por el obrero a la empresa y proveerle a éste una ayuda en lo que consigue otro trabajo. Por esto, nuestra posición ha sido constante en cuanto a que este tipo de indemnización persigue reparar los daños que le ha ocasionado al empleado el quedarse sin trabajo a

---

[46] Arthur Young v. Virgilio Vega III, *supra*, pág. 189. En cuanto a esto, los profesores Zeno Santiago y Bermúdez plantean que es a través del trabajo que "el ser humano se inserta de manera productiva en la comunidad y a la vez que desarrolla sus habilidades, pone al servicio de los demás su creatividad, lo que le permite gozar de un sentimiento de valía que es la esencia de la dignidad humana." C. Zeno Santiago y V. Bermúdez, *op.cit.*, pág. 1.

causa de un despido injustificado, de forma que se le pueda brindar un remedio reparador.[47]

Por lo general, los patronos pagan este tipo de compensación luego de un proceso judicial en el que se determina que el despido fue injustificado. Sin embargo, recientemente se ha desarrollado la práctica de pagar la mesada como resultado de un contrato de transacción, modalidad que, alegadamente, está presente en este caso. Debemos, pues, examinar el acuerdo y repasar los lineamientos del contrato de transacción.

En el Acuerdo de Relevo entre el señor Orsini García y la compañía Pfizer, Inc. se incluyeron 22 cláusulas. Un análisis integrado de cada una de éstas nos permite observar y establecer, en lo pertinente, que: (1) la compensación por la pérdida del empleo, ascendente a $163,323.66, estaba condicionada a que el señor Orsini García firmara el relevo, es decir, si éste no lo hacía no recibiría ninguna indemnización por el despido; (2) a cambio del pago, el señor Orsini García renunciaría a cualquier potencial acción bajo varias leyes laborales estatales y federales, incluyendo la Ley Núm. 80 de 1976; (3) el acuerdo convenido no constituye una admisión de responsabilidad por parte de Pfizer, Inc, (4) no se hacen constar los motivos por los cuales se cesanteó al señor Orsini García; (5) se mantendrá confidencial toda información relacionada con la terminación del empleo del

---

[47] Belk v. Martínez, 146 D.P.R. 215, 232 (1998); Beauchamp v. Holsum Bakers of P.R., 116 D.P.R. 522, 526 (1985).

señor Orsini García; y (6) si se declarase nula cualquier disposición del acuerdo, ésta se considerará eliminada, pero no se afectará la validez de las cláusulas restantes.[48]

El Código Civil dispone que a través de un contrato de transacción, "las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado."[49] En ese sentido, la finalidad de este tipo de contrato es "evitar toda controversia entendida aquélla como divergencia, disputa o debate, esto es, como situación en la que se encuentran dos personas que sostienen tesis diferentes respecto a una determinada relación."[50]

Los contratos de transacción pueden ser judiciales o extrajudiciales.[51] El primero se origina cuando las partes acuerdan eliminar una controversia, luego de haber comenzado un pleito litigioso, y solicitan incorporar la transacción al proceso judicial en curso. Distintamente, el segundo, que es el pertinente a nuestra controversia, se da cuando las partes acuerdan eliminar la controversia,

---

[48] Acuerdo de Relevo, 20 de octubre de 2003, págs. 1-4.

[49] Artículo 1709, Código Civil; 31 L.P.R.A. sec. 4821; Véase, además, López v. Maldonado, 2006 T.S.P.R. 143, 2006 J.T.S. 152, 168 D.P.R. ___ (2006); Rivera v. Rivera, 2006 T.S.P.R. 103, 2006 J.T.S. 112, 168 D.P.R. ____ (2006); Igaravidez v. Ricci, 147 D.P.R. 1, 5 (1998).

[50] S. Tamayo Haya, El Contrato de Transacción, Civitas Ediciones, S. L., Madrid, España, 2002, pág. 26.

[51] Monteagudo v. E.L.A., 172 D.P.R. ____ (2007), 2007 T.S.P.R. 153, 2007 J.T.S. 159; Igaravidez v. Ricci, supra, págs.5; Neca Mortg. Corp. v. A. & W. Dev. S.E., 137 D.P.R. 860, 870-871 (1995).

antes de iniciar un pleito judicial, o cuando comenzado el mismo las partes transan, sin la intervención del tribunal.[52]

Para que un contrato de transacción exista deben concurrir tres elementos esenciales. Estos son: (1) una controversia jurídica entre las partes, (2) la intención de los contratantes de componer el litigio, es decir, de eliminar las controversias y (3) las concesiones recíprocas de las partes.[53] Es por esto que se ha establecido que el contrato de transacción es bilateral, recíproco, oneroso y consensual, es decir, surge por el mero consentimiento de las partes.[54]

No podemos olvidar que los acuerdos transaccionales deben interpretarse restrictivamente, puesto que conllevan la renuncia de derechos.[55] Así lo establece el Código Civil, al disponer que:

> La transacción no comprende sino los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidas en la misma.

---

[52] J. R. Vélez Torres, Curso de Derecho Civil, T. IV, V. II, Revista Jurídica de la Universidad Interamericana de Puerto Rico, San Juan, P.R. 1990, pág. 498.

[53] Municipio v. Professional, 2007 T.S.P.R. 95, 2007 J.T.S. 101, 171 D.P.R. ___ (2007); López v. Maldonado, supra; Neca Mortg. Corp. v. A. & W. Dev. S.E., Íd, pág. 870; Véase, además, L. R. Rivera Rivera, El Contrato de Transacción: Sus efectos en situaciones de solidaridad, Jurídica Editores, San Juan, Puerto Rico, 1998, pág. 35.

[54] Véase: S. Tamayo Haya, op.cit., págs. 55-74; L. R. Rivera Rivera, Íd., págs, 54-60.

[55] Rivera v. Rivera, supra; Sucn. Román Febres v. Shelga Corporation, 111 D.P.R. 782, 789 (1981).

> La renuncia general de derechos se entiende sólo de los que tienen relación con la disputa sobre que ha recaído la transacción.[56]

De más está decir que la posibilidad de transacción de una controversia está supeditada al hecho de que una renuncia de derechos no puede ir en contra de la ley, el interés o el orden público. Al respecto, el Código Civil establece, en lo pertinente, que "los derechos concedidos por las leyes son renunciables, a no ser esta renuncia contra la ley, el interés o el orden público, o en perjuicio de tercero."[57]

En la controversia que está ante nuestra consideración, la compañía Pfizer, Inc. le otorgó al señor Orsini García una compensación por cesantía, a cambio de que éste relevara a la compañía de la aplicación de una variedad de leyes laborales estatales y federales, entre éstas, la Ley Núm. 80 de 30 de mayo de 1976, según enmendada.[58] Ahora bien, para resolver la controversia ante

---

[56] Artículo 1714, Código Civil, 31 L.P.R.A. sec. 4826; Véase, además, Monteagudo v. E.L.A., 2007 T.S.P.R. 153, 2007 J.T.S. 159, 172 D.P.R. ___ (2007); Blas v. Hosp. Guadalupe, 167 D.P.R. 439, 449 (2006); Crespo Cardona v. Autoridad de Carreteras, 136 D.P.R. 938 (1994); Citibank v. Dependable Ins. Co., 121 D.P.R. 503, 514 (1988); Negrón Rivera y Bonilla, Ex parte, 120 D.P.R. 61, 74-75 (1987); Sucn. Román Febres v. Shelga Corporation, *Íd*.

[57] Artículo 4, Código Civil; 31 L.P.R.A. sec. 4.

[58] Las demás leyes locales son: (1) Ley Núm. 69 de 6 de julio de 1985, Discrimen en el Empleo por Razón de Sexo; (2) Ley Núm. 115 de 20 de diciembre de 1991, Ley de Represalias en el Empleo; (3) Ley Núm. 100 de 30 de junio de 1959, según enmendada, Ley contra el Discrimen en el Empleo; (4) Ley Núm. 17 de 22 de abril de 1988, Ley para Prohibir el Hostigamiento Sexual en el Empleo; (5) Ley Núm. 44 de 2 de julio de 1985, según enmendada, Ley de

nuestra consideración no es necesario expresarnos sobre la

totalidad de la cláusula del contrato que dispone la

renuncia a las leyes laborales mencionadas.[59] Más bien, nos

basta evaluar si el trabajador puede renunciar a los

derechos concedidos por la Ley Núm. 80 de 1976. De entrada

encontramos que la Asamblea Legislativa expresamente

dispuso lo contrario, en la Ley Núm. 16 de 21 de mayo de

---

Prohibición de Discrimen contra Impedidos; (6) Artículo
1802 del Código Civil. En cuanto a las leyes laborales
federales, se eximió a la compañía Pfizer, Inc. de
responsabilidad bajo: (1) Ley de Derechos Civiles de 1866;
(2) Ley de Derechos Civiles de 1964; (3) Ley de Derechos
Civiles de 1991; (4) Ley de Discrimen por Edad en el Empleo
de 1967 (ADEA); (5) Ley de Americanos con Impedimentos de
1990 (ADA); (6) Ley de Igual Paga por Igual Trabajo; (7)
Ley de Protección de Beneficios de Trabajadores de Edad
Avanzada de 1990 (OWBPA); (8) Ley de Notificación de Ajuste
y Recapacitación de Trabajadores (WARN); (9) Licencia
Médico Familiar (FMLA); (10) Ley de Seguridad de Ingreso de
Retiro del Empleado (ERISA).

[59] No obstante, cabe recordar que las leyes protectoras del
trabajo tienen como propósito poner en vigor las
disposiciones constitucionales del aspecto sustantivo del
derecho laboral. Artículo II, sección 1, 16, Const.
E.L.A., 1 L.P.R.A. sec. 1, 16; Véase, además, R. N. Delgado
Zayas, *op.cit.*, pág. 3, 6-7. Por eso hemos resuelto, según
señala Delgado Zayas, que "gran parte de las condiciones de
trabajo establecidas en Puerto Rico en virtud de nuestra
Legislación Protectora del Trabajo es de carácter
irrenunciable." R. N. Delgado Zayas, *Íd*; Véase, además,
Benítez et als. v. J & J, 158 D.P.R. 170, 174-177 (2002);
Soc. de Gananciales v. Vélez & Assoc., 145 D.P.R. 508, 518
(1998); Nazario v. Tribunal Superior, 98 D.P.R. 846, 853
(1970). Véanse, también, las disposiciones de la Ley Núm.
379 de 15 de mayo de 1948, según enmendada por la Ley Núm.
180 de 27 de julio de 1998, que requieren la intervención
del Secretario del Trabajo y Recursos Humanos, abogado o un
mediador de dicha agencia, en cualquier transacción sobre
condiciones de trabajo protegidas por la ley. Artículo 14,
Ley Núm. 379 de 15 de mayo de 1948, según enmendada; 29
L.P.R.A. sec. 282 y el Artículo 4-7, Reglamento 3060 para
Establecer las Normas a Seguir en la Aprobación de
Transacciones de las Reclamaciones Instadas al Amparo de la
Ley Núm. 96 de 26 de junio de 1956, según enmendada, y de
la Ley Núm. 379 de 15 de mayo de 1948, según enmendada.

1982, que enmendó la Ley Núm. 80 de 1976. Dicha ley establece lo siguiente:

> Se declara irrenunciable el derecho del empleado que fuere despedido de su cargo, sin que haya mediado justa causa, a recibir la indemnización que establece el Artículo 1.
>
> Será nulo cualquier contrato, o parte del mismo, en que el empleado renuncie a la indemnización a que tiene derecho de acuerdo a esta Ley.[60]

En este caso, el expediente no revela que se hubiera renunciado a la indemnización dispuesta por Ley Núm. 80 de 1976. Más bien, la compensación ofrecida por Pfizer y aceptada por el señor Orsini García se calculó sobre la base de los requisitos de la Ley 80. En efecto, no se ha suscitado controversia alguna en cuanto al pago de la "mesada" dispuesta en dicha ley. Concluimos, entonces, que el Acuerdo de Relevo entre la compañía Pfizer Inc. y el señor Orsini García se redujo a un contrato de transacción bajo la Ley Núm. 80 de 1976.

El Departamento de Hacienda aduce que lo que el señor Orsini García recibió no constituyó el pago de mesada, sino una indemnización por cesantía o por años de servicio, conocida en inglés como "severance payment". Esta alegación nos requiere precisar los contornos de esta modalidad de pago por despido.

La profesora Mengod Gimeno precisa el concepto de indemnización por años de servicio o cesantía como "el derecho que tiene un trabajador a recibir una reparación

---

[60] 29 L.P.R.A. sec. 185i; Véase, además, García v. A.E.E.L.A., *supra*; Soc. de Gananciales v. Vélez & Assoc., *supra*, pág. 518.

pecuniaria por el daño originado por haber empleado su esfuerzo personal en beneficio de un patrón y no exclusivamente en el propio."[61]  La finalidad de este tipo de indemnización, también expresa la profesora Mengod Gimeno, es dual pues, por un lado, recompensa la fidelidad que ha tenido un empleado con la empresa para la cual trabajó por muchos años, mientras, por el otro, persigue compensar el menoscabo en la capacidad productiva del obrero en beneficio exclusivo de la compañía.[62]  En esencia, su objetivo es reparar el daño ocasionado por el despido.

En los Estados Unidos este tipo de compensación es concedido por muchas corporaciones, principalmente por las manufactureras, como parte de una política interna de personal.[63]  Es decir, la compensación por años de servicios o cesantía forma parte del paquete de beneficios que el patrono le ofrece a un empleado potencial para que acepte la oferta de empleo.  En ese sentido, es pertinente señalar que, según hemos decidido, "[e]l manual de una empresa que contiene las reglas y los reglamentos del trabajo y establece las normas, beneficios y privilegios que disfrutará el empleado, forman parte del contrato de

---

[61] R. M. Mengod Gimeno, Indemnización por Años de Servicios, Editorial Jurídica de Chile, Santiago de Chile, 1966, págs., 10-11.

[62] R. M. Mengod Gimeno, Íd., pág. 6.

[63] Personnel Policies Forum, Severance Benefits and Outplacements Services, The Bureau of National Affairs, Inc., Washington, D.C., No. 143, December 1986, pág. 3; Véase, además, Personal Policies Forum, Separation Procedures & Severance Benefits, The Bureau of National Affairs, Inc., Washington, D.C., No. 121, April 1978.

trabajo."[64] Por eso, la obligación patronal de este tipo de indemnización no surge de una actuación particular del patrono, sino que se activa por el mismo contrato de trabajo o lo que es lo mismo, por una obligación contractual.

La indemnización por años de servicio o cesantía se incorporó a nuestra normativa laboral a través de la Ley Núm. 278 de 15 de agosto de 2008, que enmienda el artículo 7 de la Ley Núm. 80 de 1976. Esta legislación define este tipo de compensación como una especial, concedida por el patrono al empleado cuando éste es despedido a causa de un cierre parcial, total, por reorganización o cambios tecnológicos de la compañía.

Vemos, pues, que todas las modalidades indemnizatorias del despido tienen la misma finalidad de reparar el daño que provoca la pérdida de un empleo. No obstante, se diferencian entre sí respecto al tipo de obligación por la cual el patrono tiene que responder.

La "mesada" es producto de una obligación legal que tiene el patrono de indemnizar a un empleado por despedirlo injustificadamente. De ordinario, este tipo de compensación se obtiene luego de un proceso judicial. Sin embargo, los patronos han optado por transar el pago de esta indemnización, mediante los denominados "Acuerdos de

---

[64] Albino v. Martínez, 2007 T.S.P.R. 111, 2007 J.T.S. 117, 171 D.P.R. ___ (2007); Vázquez v. Banco de Desarrollo, 2007 T.S.P.R. 86, 2007 J.T.S. 91, 171 D.P.R. ___ (2007); Selosse v. Fundación Educativa Ana G. Méndez, 122 D.P.R. 534, 548-49 (1988); Santiago v. Kodak Caribbean, Ltd., supra, págs. 775-776.

Relevo". Esta modalidad de compensación por despido responde a una obligación contractual, con la diferencia de que esta clase de contrato, por su naturaleza transaccional, está supeditado a que ambas partes consientan a concesiones recíprocas. Además, para que sean válidos, estos acuerdos deben cumplir con el pago total de la "mesada" porque el derecho a ésta no es renunciable. Por último, la obligación de pagar una compensación por despido o "severance pay" también es contractual porque surge de las políticas o manuales internos de la empresa. Sin embargo, ésta no tiene que cumplir con el pago total de la mesada ni se requiere que el empleado dé algo a cambio para recibirla, como en este caso, donde se requiere al señor Orsini García la renuncia a los derechos que le brindan las leyes laborales mencionadas.

La indemnización por despido recibida por el señor Orsini García no fue concedida como resultado de un trámite judicial. Tampoco fue producto de la política interna de Pfizer. Por lo tanto, es forzoso concluir que ésta fue otorgada por el patrono mediante un típico contrato de transacción, en el cual ambas partes se liberaron de los gastos, molestias, tardanzas e incertidumbre que todo litigio genera, a cambio, de que el señor Orsini García recibiera el pago de la "mesada" y Pfizer, Inc., obtuviera el puesto hasta entonces ocupado por el empleado.

C. **La aplicación de la normativa contributiva a la indemnización por despido**

La responsabilidad de definir y establecer la política pública económica y fiscal del país corresponde a la Rama Ejecutiva. Sin embargo, la viabilidad de esa política pública fiscal sólo es posible a través de los estatutos contributivos que elabora la Asamblea Legislativa. A esos efectos, nuestra Constitución dispone que:

> El poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios, se ejercerá según se disponga por la Asamblea Legislativa y nunca será rendido o suspendido…[65]

Esta facultad es la más fundamental de los poderes públicos y gubernamentales, esencial a la subsistencia y para la supervivencia de la soberanía del estado.[66] Ante esta responsabilidad constitucional, la Rama Legislativa ha aprobado, a través de los años, diversas leyes contributivas cuyo tributo, denominado "progresivo", se aumenta conforme incrementa el ingreso tributable de las diversas clases de contribuyentes que están sujetos a contribución sobre ingreso.[67]

Como resultado de la reforma contributiva de 1994 el sistema contributivo de nuestro país está integrado en un solo documento, el Código de Rentas Internas de 1994, que recoge toda la legislación contributiva que antes se

---

[65] Artículo VI, Sec. 2, Const. E.L.A., 1 L.P.R.A. sec. 2.

[66] Municipio v. Professional, 2007 T.S.P.R. 95, 2007 J.T.S. 101, 171 D.P.R. ____ (2007); Burlinton Air Express, Inc. v. Mun. de Carolina, 154 D.P.R. 558, 597 (2001); RCA v. Gob. de la Capital, 91 D.P.R. 416, 428 (1964).

[67] G. Meléndez Carrucini, Ingreso Tributable: Inclusiones y Doctrinas, 1era Edición, San Juan, Puerto Rico, Instituto de Contribuciones de Puerto Rico, Inc., 1991, pág. 12.

encontraba dispersa.[68]  Esta reforma estuvo enmarcada en varios principios u objetivos principales que son, en lo pertinente: "(1) atender el reclamo de la clase media respecto al pago justo de sus contribuciones; (2) imponer contribuciones en consonancia con la capacidad de pago de las personas; (3) generar las menos distorsiones en el sistema económico y social."[69]

A pesar de estos principios inspiradores, la tributación es "una institución social que grava la economía privada de los ciudadanos."[70]  Por eso, la contribución sobre ingreso es el impuesto que más controversia origina entre el Departamento de Hacienda y el contribuyente.  Siendo ello así, siempre surgen entre los contribuyentes interrogantes respecto a si una partida constituye o no "ingreso" o "ingreso bruto" para fines contributivos. Este cuestionamiento es sumamente importante porque el "ingreso bruto" es el punto de partida para calcular el "ingreso neto tributable".

El Código de Rentas Internas de 1994 provee una definición general y amplia que compendia una pluralidad de partidas constitutivas del concepto "ingreso bruto".  Esta definición estatutaria establece lo siguiente:

---

[68] Esta ley fue enmendada por la Ley Núm. 117 de 4 de julio de 2006 conocida como "La Ley de la Justicia Contributiva de 2006".

[69] Exposición de Motivos, Código de Rentas Internas de 1994, 13 L.P.R.A. sec. 8007.

[70] M. Tirado Viera, Fundamentos de las Contribuciones sobre Ingresos de Puerto Rico, 2da Edición, 1986, pág. 1.

> **"Ingreso bruto" incluye ganancias, beneficios e ingresos derivados de sueldos, jornales o compensación por servicios personales** (incluyendo la retribución recibida por servicios prestados como funcionario o empleado del Estado Libre Asociado de Puerto Rico, de cualquier estado de la Unión, de los Estados Unidos, o de cualquier subdivisión política de los mismos, o de cualquier subdivisión política de los mismos, o de cualquier agencia o instrumentalidad de cualesquiera de las mencionadas entidades) **de cualquier clase y cualquiera que sea la forma en que se pagaren**, o de profesiones, oficios, industrias, negocios, comercio o ventas, o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso o del interés en tal propiedad; también los derivados de intereses, rentas, dividendos, beneficios de sociedades, valores o la operación de cualquier negocio explotado con fines de lucro o utilidad y **ganancias o beneficios e ingresos derivados de cualquier procedencia.**[71]

En esencia, esta definición contiene, según el licenciado Meléndez Carrucini, cinco conceptos de ingresos: (1) **"compensación por servicios personales prestados"**; (2) "ingreso de industrias y negocios"; (3) "operaciones en propiedad"; (4) "ingreso de propiedad y valores" y (5) **"residuo – ingreso de cualquier procedencia."**[72] Al referirse a la clasificación de ingreso residual, Meléndez Carrucini enfatiza en que mediante este lenguaje se recoge la definición misma de lo que constituye ingreso bruto, es decir, ganancias, beneficios o ingresos.[73] En otras palabras, para que una partida sea clasificada como

---

[71] Sección 1022, supra., 13 L.P.R.A. sec. 8422 (Suplemento Acumulativo 2008).

[72] G. Meléndez Carrucini, Ingreso Tributable: Inclusiones y Doctrinas, *op.cit.*, pág. 150.

[73] G. Meléndez Carrucini, Ingreso Tributable: Inclusiones y Doctrinas, *Íd*, pág. 152.

"ingreso bruto" deberá ser ganancia, beneficio o ingreso producto del trabajo o del capital.

Por su parte, el licenciado Tirado Viera propone tres elementos particulares para determinar si una partida tributa o no tributa. Éstos son, primeramente, "que la partida constituya una acreencia de capital", luego, que no esté expresamente excluida como ingreso bruto por la ley o el reglamento y, finalmente, "que la partida sea realizada por el contribuyente."[74] Aplicados estos criterios a un contrato de trabajo, encontramos que la acreencia de capital es el sueldo o salario que obtiene un trabajador. Mientras, la denominada realización de la partida se hace patente con la acción del patrono de transferirle al empleado dicha compensación por los servicios prestados.

Como regla general, en una relación de patrono y empleado se presume que cualquier tipo de compensación que reciba un trabajador de su empleador será en resarcimiento de la labor realizada y, como obvio resultado, un ingreso tributable.[75] Sin embargo, esta presunción desaparece si la compensación al trabajador no cae dentro de la definición general de ingreso bruto, es decir, no es "ganancia, beneficio e ingreso derivados de sueldos, jornales o compensación por servicios personales" o si la compensación no es tampoco "una ganancia, beneficio e ingreso derivado

---

[74] M. Tirado Viera, *op.cit.*, pág. 27, nota 5.
[75] Flax v. Tesorero de P.R., supra, pág. 393; Véase, además, G. Meléndez Carrucini, Ingreso Tributable: Inclusiones y Doctrinas, *op.cit.*, pág. 246.

de cualquier procedencia".[76] Si no se trata de ninguno de estos supuestos, el empleado no tendrá que tributar por la indemnización otorgada por el patrono. Es decir, si se determina que la compensación no constituye salario o sueldo, automáticamente habrá que examinar si se puede clasificar como una ganancia, beneficio o ingreso proveniente de cualquier procedencia. Si se concluye que la compensación corresponde a uno de los dos tipos de ingresos mencionados, será necesario examinar si el obrero que recibe la compensación puede beneficiarse de una de las exclusiones o exenciones contributivas, de manera que no tenga que tributar por ésta.

Es importante establecer, como elemento de la primera parte de este análisis, que el que una partida sea exenta de la retención contributiva en el origen, porque no constituye salario, no implica que también resultará exenta de contribución.[77] Ambos conceptos, la contribución y la retención en el origen, tienen acepciones e implicaciones distintas.

Por un lado, la contribución es la porción que el Estado, al estructurar su sistema tributario, determina que deben aportar anualmente los ciudadanos, sociedades o

---

[76] Sección 1022, supra., 13 L.P.R.A. sec. 8422 (Suplemento Acumulativo 2008).

[77] Departamento de Hacienda, Reglamento para Implantar las Disposiciones de la Sección 1141 de la Ley Núm. 120 de 31 de octubre de 1994, según enmendada, conocida como Código de Rentas Internas de Puerto Rico de 1994, 22 de diciembre de 2000, pág. 1.

corporaciones, en razón de sus ingresos.[78] Es el nombre "que se da al tributo que importa la prestación obligatoria debida en razón de beneficios individuales o de grupos sociales, derivados de la realización de obras públicas o de actividades especiales del Estado."[79] En otras palabras, es lo que facilita que se puedan proveer todos los servicios que el gobierno le brinda a la comunidad en general.

Mientras, por otro lado, la retención de la contribución en el origen es una responsabilidad legal que recae sobre aquellas personas que realizan pagos de salarios, principalmente, u otros renglones constitutivos de ingresos.[80] El Código de Rentas Internas de 1994 le impone a los patronos la obligación de retener contribución en el origen en los casos de salario. En cuanto al término salario, el estatuto limita su definición en la siguiente forma:

> **Toda remuneración por servicios prestados por un empleado para su patrono**, y toda remuneración en

---

[78] Véase: R. Moreno Rodríguez, <u>Diccionarios de Ciencias Sociales</u>, Dicciobibliografía Editora S.R.L., Argentina, Buenos Aires, 2003, pág. 351; Véase, además, I. Rivera García, <u>Diccionario de Términos Jurídicos</u>, 3ra Edición, Lexis Nexis of Puerto Rico, Inc., San Juan, P. R., 2000, págs. 54-55, donde se define el concepto contribución de la siguiente forma:

  Tributo que recae sobre los rendimientos de un bien o que grava la obtención de un beneficio para el contribuyente o el aumento del valor de un bien como consecuencia de una actuación administrativa.

[79] S. Grecco, <u>Diccionario de Economía y Negocios</u>, Espasa, 2002, pág. 123.

[80] M. Tirado Viera, <u>op.cit.</u>, pág. 394.

concepto de pensión por servicios prestados, incluyendo el valor en dinero de toda remuneración pagada por cualquier medio que no sea dinero…[81]

No toda remuneración es salario. Por eso, el mismo estatuto excluye de la definición de salario, y por ende de la retención en el origen, la indemnización que un patrono tiene que pagarle a un trabajador cuando lo despide sin justa causa, según dispone la Ley Núm. 80 de 1976, según enmendada.[82] Esta exclusión a la retención se estableció mediante la Ley Núm. 2 de 6 de octubre de 1987 que enmendó a esos efectos la Ley de Contribuciones sobre Ingresos de 1954.[83] De esa forma, se complementó y armonizó lo que disponía la Ley Núm. 16 de 21 de mayo de 1982, que enmendó la Ley Núm. 80 de 1976, para establecer que no se podría realizar descuento de nómina a la indemnización por despido injustificado.[84] El fundamento de la Asamblea Legislativa para enmendar esta legislación laboral fue que este tipo de indemnización "no se considera salario y sí una

[81] Anteriormente esta cita se encontraba en 13 L.P.R.A. sec. 1341 (a) (1). No obstante, para la fecha de esta controversia es Sección 1141, supra, 13 L.P.R.A. sección 8541 (a) (1).

[82] Antes la cita se encontraba en 13 L.P.R.A. sec. 1341 (a) (1) (h), pero para la fecha del litigio es Sección 1141, supra, 13 L.P.R.A. sec. 8541 (a) (1) (G); Departamento de Hacienda, Reglamento para Implantar las Disposiciones de la Sección 1141 de la Ley Núm. 120 de 31 de octubre de 1994, según enmendada, conocida como Código de Rentas Internas de Puerto Rico de 1994, supra, págs., 16-17.

[83] 13 L.P.R.A. sec. 3141 (a) (1) (h).

[84] Actualmente, se encuentra en el Artículo 10, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185j.

compensación por los daños ocasionados por el despido injustificado."[85]

En Alvira Cintrón v. S.K. & F. Laboratories Co., sostuvimos enfáticamente que la mesada no es un salario sino el resarcimiento de un daño producto del despido injustificado, por lo cual no puede estar sujeta a ningún descuento de nómina, inclusive el del seguro social federal. Nuestra posición estuvo fundamentada en que un análisis contrario podría desvirtuar el noble propósito que persigue la Ley Núm. 80 de 1976.[86] La Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80 del Departamento del Trabajo y Recursos Humanos reitera esta interpretación que es coherente con las disposiciones de la propia Ley Núm. 80 de 1976.[87] En específico este estatuto dispone:

> Todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, designado en lo sucesivo como establecimiento, donde trabaja mediante remuneración de alguna clase contratado sin tiempo determinado, que fuere despedido de su cargo sin que haya mediado una justa causa, **tendrá derecho a recibir de su patrono en adición al sueldo que hubiere devengado…**

[85] Historial Legislativo, Informe de la Comisión del Trabajo y Asuntos del Veterano, P. del C. 320, 21 de abril de 1982.

[86] Alvira v. SK & F Laboratories Co., 142 D.P.R. 803, 812-813 (1997); Véase, además, Municipio de Coamo v. Tribunal Superior, 99 D.P.R. 932, 940 (1971), donde también expresamos que el remedio sobre los despidos ilegales no constituye una remuneración por servicios prestados y sí una indemnización en dinero tradicionalmente concedida en estos casos, siendo el sueldo sólo la base para computarlo.

[87] Departamento del Trabajo y Recursos Humanos, Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80, Aprobada el 30 de mayo de 1976, según enmendada, 28 de marzo de 2000, pág. 43.

(a) El sueldo correspondiente a un mes **por concepto de indemnización,** si el despido ocurre dentro de los primeros cinco (5) años de servicio; el sueldo correspondiente a dos (2) meses si el despido ocurre luego de los cinco (5) años hasta los quince (15) años de servicio; el sueldo correspondiente a tres (3) meses si el despido ocurre luego de los quince (15) años de servicio;

(b) **una indemnización progresiva adicional** equivalente a una semana por cada año de servicio.[88]

Sobre esto el licenciado Acevedo Colom expresa lo siguiente:

La indemnización por despido injustificado que dispone la Ley Núm. 80, supra, no surge por concepto de servicios prestados por el empleado, pues una persona puede prestar servicios para su patrono durante tiempo ilimitado y no tendrá derecho a recibir la misma sino media el despido sin justa causa. Tampoco tendrá derecho a recibirla si se acoge al retiro o jubilación o cesa en su empleo por causa justificada. Es el acto del patrono de despedir al empleado sin justa causa lo que da lugar a recibir la indemnización mencionada.[89]

El Código de Rentas Internas de 1994 claramente establece que lo único que no se considerará salario, para propósitos contributivos, es la indemnización por **despido injustificado.** No obstante, esto no significa que es imperativo recurrir a los tribunales para que se determine, sin lugar a dudas, que en efecto el despido fue

---

[88] Énfasis Suplido. Artículo 1, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 29 L.P.R.A. 185(a). Como mencionamos previamente, este artículo fue enmendado por la Ley Núm. 128 de 7 de octubre de 2005, a los efectos de aumentar los beneficios del remedio exclusivo.

[89] A. Acevedo Colom, Legislación Protectora del Trabajo, 8va Edición, Ramallo Printing Bros, San Juan, P. R., 2005, pág. 174.

injustificado y que, por lo tanto, la compensación recibida no es salario y no está expuesta a la retención en el origen. Es decir, no se requiere que se determine en un proceso judicial que el despido fue ilegal e injustificado, para beneficiarse del estatuto contributivo.

La indemnización por cesantía o años de servicios ("severance pay") también está exenta de retención en el origen. Esta conclusión es consistente con la Ley Núm. 278 de 15 de agosto de 2008[90] que establece que no estarán sujetos a descuento de nómina las indemnizaciones por cesantía, años de servicios o cualquier cantidad de dinero que el patrono le otorgue a los empleados por concepto de:

> (d) Cierre total, temporero o parcial de las operaciones del establecimiento;
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público y
> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.[91]

Durante el proceso de evaluación de esta medida, el Departamento del Trabajo y Recursos Humanos recalcó que "el propósito de este proyecto es liberar de deducciones toda

---

[90] La Ley Núm. 278 de 15 de agosto de 2008 enmendó el Artículo 7 y 10 de la Ley Núm. 80 de 30 de mayo de 1976. El primer intento para probar este tipo de legislación fue en el 2005, P. del S. 210. Véase, además, Comisión de Gobierno y Asuntos Laborales, y la de Hacienda, Informe Conjunto Positivo sobre el P. del S. 210, 28 de noviembre de 2005. El expediente del P. del S. 210 se adoptó para evaluar el P. del S. 2455, que eventualmente se convirtió en la ley citada, porque atendía el mismo asunto.

[91] 29 L.P.R.A. sec. 185b.

aquella compensación o regalía que el patrono haga a sus empleados cuando cierre su negocio, sufra cambios tecnológicos o una reorganización."[92] Por eso es que la ley faculta al patrono y al empleado para acordar los descuentos, si algunos, que deseen imponerle a la indemnización por cesantía o años de servicios.[93]

También se beneficia de esta legislación el pago que un patrono le otorga a un empleado mediante un acuerdo de transacción, a cambio de que el trabajador le devuelva su empleo y lo releve de una reclamación judicial bajo la Ley Núm. 80 de 1976.[94] Es imperativo recordar que bajo la Ley Núm. 80 de 1976 todo despido se presume injustificado hasta que el patrono demuestre lo contrario.[95] El principio

---

[92] Comisión del Trabajo y Asuntos Laborales, Informe Negativo de la Cámara de Representantes sobre el P. del S. 2455, 18 de junio de 2008; Comisión de Hacienda y Asuntos Financieros, Informe Negativo de la Cámara de Representantes sobre el P. del S. 210, 10 de abril de 2008.

[93] Artículo 2, Ley Núm. 278 de 15 de agosto de 2008.

[94] Limitamos el análisis contributivo a un típico contrato de transacción bajo Ley Núm. 80 de 1976, porque no está ante nuestra consideración otros aspectos del contrato entre Pfizer, Inc. y el señor Orsini García.

[95] Artículo 8, Ley Núm. 80 de 30 de mayo de 1976, 29 L.P.R.A. sec. 185k; Delgado Zayas v. Hosp. Int. Med. Avanzada, supra, pág. 650; Rivera Águila v. K-mart de P.R., 123 D.P.R. 599, 610 (1989); Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 546-547 (1979). Para rebatir esta presunción, el patrono debe presentar, en un proceso judicial, aquella prueba que establezca que hubo justa causa para el despido. Díaz Fontánez v. Wyndham Hotel Corp., supra, pág. 378; Delgado Zayas v. Hosp. Int. Med. Avanzada, supra. Es decir, el peso de la prueba para establecer que el despido fue justificado recae en el patrono y el criterio, como en cualquier proceso civil, es el de preponderancia de la prueba. Díaz Fontánez v. Wyndham, Íd; Belk v. Martínez, supra, pág. 231; Srio. del Trabajo v. ITT, supra, págs. 546-547. Corresponde a los

rector de que el despido fue injustificado o ilegal es el fundamento para que esta modalidad de compensación, al igual que la "mesada" pagada como resultado de un juicio contencioso, esté exenta de los descuentos de nóminas.

Hemos visto que ni la "mesada" concedida judicial o extrajudicialmente, mediante un acuerdo de transacción en el cual se releva al patrono de una potencial reclamación bajo Ley Núm. 80 de 1976, ni el "severance pay", constituyen salario, logrando así rebasar la primera parte del análisis que debe utilizarse para determinar si el obrero tributa por estos conceptos. Ahora debemos precisar si este tipo de indemnización constituye "ganancia, beneficio e ingreso derivado de cualquier procedencia", sobre el cual el empleado tenga que tributar. Si en efecto se trata de alguna de estas formas de ingreso bruto, será necesario determinar si hay una exención o exclusión contributiva que exonere totalmente al empleado de tributar sobre dicha partida. Veamos.

Sin duda, cualquier tipo de indemnización por despido representa para el trabajador un beneficio. Sobre esta partida, el poder legislativo tendría la potestad constitucional para imponer tributos. Sin embargo, para aliviar el impacto social del gravamen tributario, la Rama

---

tribunales "determinar, después de considerar los hechos y circunstancias especiales de cada caso, si el despido de un obrero estuvo justificado o si fue caprichoso." Mercado v. Hull Dobbs Corp., 90 D.P.R. 864, 868 (1964). Esto implica que la presunción de que el despido es injustificado no cede a menos que ambas partes, empleado y patrono, diluciden esta controversia ante los tribunales.

Legislativa ha elaborado una variedad de exclusiones en

beneficio del contribuyente.  Una de esas exclusiones del

ingreso bruto son las compensaciones que las personas

reciben por lesiones o enfermedad.  Sobre el particular, y

al momento de los hechos de este caso, el Código tributario

disponía como sigue:

> (5) Compensación por lesiones o enfermedad – Excepto en el caso de cantidades atribuibles a, pero no en exceso de, las deducciones concedidas bajo la sec. 8423(aa)(2)(p) de este título en cualquier año contributivo anterior, las cantidades recibidas por razón de seguros contra enfermedad o accidente **o bajo leyes de compensaciones a obreros, como compensación por lesiones personales o por enfermedad, más el monto de cualquier indemnización recibida, en procedimiento judicial o en transacción extrajudicial, por razón de dichas lesiones o enfermedad**, y en cantidades recibidas como pensión, anualidad o concesión análoga por lesiones personales o enfermedad, y por razón de incapacidad ocupacional y no ocupacional, incluyendo las que resulten del servicio activo en las fuerzas armadas de cualquier país.[96]

---

[96] Este precepto fue adoptado en la Sec. 22 (b) (5), 13 L.P.R.A. sec. 3022 (b) (5), de la Ley de Contribuciones sobre Ingresos de 1954, Ley Núm. 91 de 29 de junio de 1954, y se mantuvo en la Ley de Contribuciones sobre Ingresos de 1994, Ley Núm. 120 de 31 de octubre de 1994, Sección 1022, supra, 13 L.P.R.A. sec. 8422 (b) (5) (Suplemento 2008). Al amparo de ésta el Secretario de Hacienda aprobó la Determinación Administrativa 98-01, que discutimos más adelante.  Esta sección fue enmendada por la Ley de la Justicia Contributiva del 2006, Ley Núm. 117 de 4 de julio de 2006, a los efectos de excluir del ingreso bruto, en lo pertinente, aquellas indemnizaciones por "lesiones **físicas** personales" o por "enfermedad **física**" que se obtienen a través de un procedimiento judicial o de una transacción extrajudicial.

Como resultado de esta enmienda el Secretario de Hacienda aprobó una nueva determinación administrativa, para revocar la anterior, indicando que las compensaciones concedidas por los daños y perjuicios morales sufridos o las angustias y sufrimientos mentales no están excluidos del ingreso bruto, por lo cual tendrán que pagar tributo. Determinación Administrativa Núm. 07-01, Tratamiento

Interpretando esta sección, en un caso sobre si era privativa o ganancial la compensación que recibía un cónyuge por daños y perjuicios a su persona, resolvimos que las sumas recibidas por concepto de indemnización por daños no son ganancias y no están sujetas a la contribución sobre ingresos.[97] Trece años después reiteramos esta determinación. En esa ocasión, analizando si el lucro cesante producto de una lesión o enfermedad estaba exento del ingreso bruto, determinamos que la indemnización por lucro cesante se concede para sustituir los ingresos provenientes del trabajo y como tal es tributable.

---

Contributivo de Indemnización Recibida por Concepto de Daños y Perjuicios, por Razón de Incapacidad Ocupacional y No Ocupacional; y Pagos por Terminación de Empleo, 12 de enero de 2007, págs. 2-3.  En esta determinación se mantuvo la "mesada" como parte del ingreso bruto. Determinación Administrativa Núm. 07-01, op.cit., págs. 3.

Un año después, el Secretario de Hacienda enmendó la Determinación 07-01, a los efectos de aclarar que las indemnizaciones recibidas por las angustias mentales **que se originan como resultado de una lesión o enfermedad física serán excluidas del ingreso tributable.** Determinación Administrativa Núm. 08-04, Enmienda a Determinación Administrativa Núm. 07-01 Relativa al Tratamiento Contributivo de Indemnización Recibida por Concepto de Daños y Perjuicios, por Razón de Angustias Mentales Incidentales a Daños Físicos, 22 de mayo de 2008, págs. 2-3.  En otras palabras, no se podrán excluir del ingreso bruto y serán tributables las compensaciones por los daños morales que no se originen en daños físicos.

Esta enmienda y las subsecuentes determinaciones administrativas del Departamento de Hacienda, que son posteriores a la controversia que está ante nuestra consideración, en forma alguna alteran nuestra determinación de que no es tributable la indemnización por despido, independientemente de la modalidad indemnizatoria que se utilice.

[97] Robles Ostolaza v. U.P.R., 96 D.P.R. 583, 595-596 (1965).

Mientras, la indemnización que se recibe por una lesión o enfermedad persigue resarcir o restaurar el daño personal sufrido y por eso está excluida del pago de contribución sobre ingresos.[98]

La Asamblea Legislativa delegó en el Departamento de Hacienda la responsabilidad de implementar, administrar e interpretar las leyes contributivas de Puerto Rico. Cumpliendo esta encomienda, el Secretario de Hacienda interpretó la sección 1022 (b) (5) del Código de Rentas Internas de 1994, previamente transcrita, relacionada con la "indemnización recibida en procedimiento judicial o en transacción extrajudicial… como compensación por lesiones personales o enfermedad", para establecer que la única forma en que se puede aplicar esta exclusión del ingreso bruto es si el contribuyente logra demostrar que:

> 1. La causa de acción que da paso a la indemnización está basada en una causa de acción de derechos torticeros (daños y perjuicios) o de tipo torticero; y
>
> 2. Que la indemnización se recibió por razón de lesiones personales o de enfermedad.[99]

De acuerdo al Secretario de Hacienda la causa de acción se fundamenta en derechos torticeros si el pago recibido se satisface para indemnizar lesiones personales, tales como "el dolor, el sufrimiento, las angustias mentales, los

---

[98] Publio Díaz v. E.L.A., *supra*, pág. 869.
[99] Determinación Administrativa Núm. 98-01, Tratamiento Contributivo de Indemnización Recibida por Concepto de Daños y Perjuicios, 1 de julio de 1998, pág. 1.

daños a la reputación"[100], entre otros.  En este grupo excluido del ingreso bruto, el Secretario de Hacienda no incluye la indemnización por despidos injustificados recibidos por virtud de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada.[101]

Como norma general, los tribunales deben sopesar la interpretación que hace una agencia sobre el significado y la aplicación de sus estatutos, desde una perspectiva de gran deferencia.  De esa forma reconocemos el conocimiento especializado de las agencias y que son ellas las llamadas a ejercer los poderes delegados por la Legislatura.[102]  No obstante, esta deferencia judicial al conocimiento o "expertise" administrativo cederá ante una actuación irrazonable, ilegal o constitutiva de resultados contrarios al propósito y la política pública del estatuto.[103] Resolvemos que la interpretación del Departamento de Hacienda sobre la sección 1022 (b) (5) del Código de Rentas

---

[100] Determinación Administrativa Núm. 98-01, _Íd_.

[101] Determinación Administrativa Núm. 98-01, _Íd_, pág. 2.

[102] Rodríguez v. Guacoso Auto, 166 D.P.R. 433, 441 (2005); Procuradora Paciente v. MCS, 163 D.P.R. 21, 43 (2004); Pacheco Torres v. Estancias de Yauco, 160 D.P.R. 409, 433 (2003); Assoc. Ins. Agencies, Inc. v. Com. Seg. P. R., 144 D.P.R. 425, 436 (1997); Vázquez v. A.R.P.E., _supra_, pág. 524; De Jesús v. Depto. Servicios Sociales, 123 D.P.R. 407, 418 (1989); Tormos & D.A.C.O. v. F.R. Technology, 116 D.P.R. 153, 160 (1985).

[103] Martínez v. Rosado, 165 D.P.R. 582, 589 (2005); Asoc. Vec. H. San Jorge v. U. Med. Corp, 150 D.P.R. 70, 75 (2000); Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750, 761 (1999); Comisionado de Seguros v. Antilles Ins. Co., 145 D.P.R. 226, 233 (1998); Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020, 1042 (1992); De Jesús v. Depto. Servicios Sociales, _Íd_.

Internas de 1994 es contraria no tan sólo a la legislación contributiva y laboral del país, sino a nuestra jurisprudencia, que ha establecido que la compensación por despido injustificado no constituye el pago de un salario adeudado sino una indemnización del daño ocasionado por el despido.

La interpretación del Departamento de Hacienda de los "derechos torticeros" o "daños y perjuicios" es injustificadamente restrictiva. Es totalmente contraria a la de destacados especialistas en materia contributiva, como el licenciado Meléndez Carrucini quien concluye que por ser de naturaleza torticera, las compensaciones obtenidas al amparo de la Ley Núm. 80 de 1976, no deben considerarse ingreso para propósitos tributarios.[104] El licenciado Meléndez Carrucini sustenta su posición en el carácter reparador del estatuto y en que "la acción bajo dicha ley sería para reclamar unas indemnizaciones por un acto injustificado de un patrono que despide sin justa causa al empleado, y no para cobrar unos sueldos que no habían sido pagados."[105] Además, Meléndez Carrucini señala que las enmiendas a la Ley Núm. 80 de 1976 y a la Ley de Contribución sobre Ingresos de 1954, ambas discutidas previamente, validan su interpretación en la medida en que establecieron que la indemnización por despido

---

[104]  G. Meléndez Carrucini, Ingreso No Tributable: Exclusiones y Doctrinas, *op.cit.*, pág. 556.

[105]  G. Meléndez Carrucini, Ingreso No Tributable: Exclusiones y Doctrinas, *Íd*, pág. 557.

injustificado no estaría sujeta a ningún descuento de nómina. Concluye que éstas son reflejo de la intención legislativa de no considerar como ingreso esta compensación.[106]

Hemos definido el concepto de daño como "todo aquel menoscabo material o moral que sufre una persona ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra."[107] Esta concepción amplia del daño es aplicable al despido porque éste tiene efectos adversos en la vida del trabajador.

Como expresa la Guía Revisada del Departamento del Trabajo, supra, el rompimiento de la relación laboral en muchos casos "conlleva para el trabajador y sus dependientes la pérdida de su único medio de sustento económico y por lo tanto, la incapacidad para poderse suplir los artículos y servicios que resultan indispensables para su diario vivir."[108] Se ha documentado

---

[106] G. Meléndez Carrucini, Ingreso No Tributable: Exclusiones y Doctrinas, *Íd*, pág. 558.

[107] López v. Porrata Doria, 169 D.P.R. ____ (2006), 2006 T.S.P.R. 149, 2006 J.T.S. 158; Lebrón v. Díaz,165 D.P.R. 615, 620 (2005); Santini Rivera v. Serv Air, Inc., 137 D.P.R. 1, 7 (1994); García Pagán v. Shiley Caribbean, ETC, *supra*, págs. 205-206 (1988); Veáse, además, C. J. Irizarry Yunqué, Responsabilidad Civil Extracontractual: Un Estudio Basado en las Decisiones del Tribunal Supremo de Puerto Rico, 6ta Edición, Panamericana Formas e Impresos S. A., Colombia, 2007, págs. 299-341.

[108] Departamento del Trabajo y Recursos Humanos, Guía Revisada para la Interpretación y Aplicación de la Ley 80, Aprobada el 30 de mayo de 1976, según enmendada, 28 de marzo de 2000, pág. 1.

que algunos de los efectos morales más comunes que provoca esta situación son: "la ansiedad; el fuerte daño a la autoestima; los sentimientos de culpa; el deterioro del auto-concepto; la depresión y el abandono."[109] Además, los estudios sugieren que el despido en personas con una carrera de trabajo ya avanzada, conlleva no sólo el menoscabo económico sino que ocasiona otras consecuencias sustanciales a la salud.[110]

---

[109] V. L. Hamilton y otros, "Hard Times and Vulnerable People: Initial Effects of Plant Closing on Autoworkers' Mental Health", Vol. 31, Journal of Health and Social Behavior, pág. 1, (1990); J. E. Brand y B. R. Ley, "Effects of Layoffs and Plant Closings on Depression Among Older Workers", California Center for Population Research, University of California, Los Angeles, pág. 4, (2007). Véase, además, W. T. Gallo y otros, "The Effect of Recurrent Involuntary Job Loss on the Depressive Symptoms of Olders US Workers", Int Arch Occup Environ Health, Vol. 80, Núm. 2, pág. 2, (Noviembre, 2006). Earlier research (Gallo et. al. 2000), based on US Health and Retirement Survey (HRS) data, reported a significant association between a single involuntary job loss and increases in depressive symptoms among individuals aged 51-61 years, the decade prior to eligibility for early public retirement benefits.

[110] Véase el estudio de la Escuela de Medicina y el Departamento de Epidermiología y Salud Pública de la Universidad de Yale, New Haven, Conneticut, USA. El grupo estaba compuesto por los doctores W.T. Gallo, H.M. Teng, T. A. Falba, S. V. Kast, H. M. Krumholz y E.H. Bradley. Los resultados del mismo se pueden obtener en el National Institute of Health (NIH), PMC, Marzo 30, (2007). Véase, además, "The impact of late career job loss on myocardial infarction and stroke: a 10 year follow up using the health and retirement survey", Vol. 63, Núm.10, Occupational Environmental Medicine, págs. 683-678, (Octubre, 2006).

Un equipo de investigadores de los Estados Unidos que se dio a la tarea de perfeccionar la metodología existente para estimar los efectos de la pérdida de empleo involuntaria en la salud de las personas afectadas, encontró que los trabajadores desempleados desarrollan un estado de salud más precario que aquellos que se mantienen empleados. S. A. Burgard, J. E. Brand y J. S. House,

Ante esta realidad, es ineludible concluir que las indemnizaciones por despido, producto de una reclamación judicial o de una transacción extrajudicial, son exentas de contribución sobre ingresos, puesto que cualifican para la

---

"Toward a Better Estimation of the Effect of Job Loss on Health", Vol. 48, Núm. 4, Journal of Health and Social Behavior, págs. 369-384, (Dec. 2007). Éstos citan los estudios de D. Dooley, J. Fielding y L. Levi. "Health and Unemployment", Núm. 17, Annual Review of Public Health, págs. 449-465, (1996); J. Brand "The Effects of Job Displacement on Job Quality: Findings from the Wisconsin Longitudinal Study", Núm. 24, Research in Social Stratification and Mobility, págs. 275-298, (2006); H. S. Faber, "Job Loss in the United States, 1981-2001." Working Paper No. 9707, Cambridge, MA, National Bureau of Economic Research; James S. House. "Chronic Stress and Chronic Disease in Life and Work: Conceptuel and Methodological Issues", Vol. 1, Work and Stress, págs. 129-134, (1987).

Tras analizar los resultados de dos estudios longitudinales que duraron respectivamente 15 y 35 años, los investigadores concluyeron que persiste una asociación significativa entre la pérdida involuntaria del empleo y el deterioro de la salud física y mental, luego de controlar todas las variables o factores que podrían influenciar los resultados.

> …Though limited in number, exiting longitudinal studies have shown that job loss is linked to a greater number of reported medical conditions, higher rates of use of medical services, and higher rates of use of pension disability benefits (Ferrie et al., 1998), as well as poorer physical functioning (Gallo et al., 2000) and increase in self-reported physical illness (Turner, 1995). Other longitudinal studies have also shown that job loss is associated with worsening of phychological symptoms such as depression, somatization and anxiety (Dooley, Catalano and Wilson). J. E. Ferrie, et. al. "An Uncertain Future: The Health Effects of Threats in Employment Security in While-Collar Men and Women", Núm. 88, American Journal of Public Health, págs. 1030-1036, (1998); Gallo et. al. *op. cit.*; J. Blake Turner. "Economic Context and the Health Effect of Unemployment", Núm. 36, Journal of Health and Social Behavior, págs. 213-229, (1995); Dooley et. al. *op.cit.*, según citado en S. A. Burgard, J. E. Brand y J. S. House, *op. cit.*, pág. 371.

exclusión contributiva que posibilita el que las indemnizaciones cuya finalidad sea reparar una lesión personal o enfermedad, sean exentas de tributación. Este análisis no es necesario aplicarlo a las indemnizaciones por cesantía o por años de servicios ("severance payments") porque ya la Asamblea Legislativa estableció de forma expresa que este tipo de compensación especial está exenta del pago de contribuciones sobre ingresos.[111]

### III.

El Departamento de Hacienda recurrió ante este tribunal planteando, en esencia, que la compensación por despido que Pfizer, Inc le otorgó al señor Orsini García era tributable. Argumentó su posición en que este pago no tenía la finalidad de resarcir un daño físico y emocional o por concepto de lesiones personales o enfermedad que es el único tipo de compensación que está exenta de tributación. Esto, según Hacienda, en consonancia con la norma restrictiva que permea las exclusiones del ingreso bruto.

Planteó, además, que el pago se había recibido en concepto de "severance payment" y que como tal, para la fecha de los hechos, era tributable; que el pago no se había concedido en concepto de "mesada" para resarcir un daño por despido injustificado y que, de ser así, también sería tributable. Esto bajo el fundamento de que la interpretación de la legislación contributiva le correspondía al Departamento de Hacienda y que dichas

---

[111] Artículo 2, Ley Núm. 278 de 15 de agosto de 2008. Este artículo enmendó el artículo 10 de la Ley Núm. 80 de 1976.

interpretaciones merecen gran deferencia. Por su parte, el planteamiento del señor Orsini García se basa en que la indemnización por despido injustificado no es tributable porque su finalidad es resarcir el daño ocasionado por la pérdida del empleo.

Es cierto que la concepción del término "ingreso bruto" es amplia y abarcadora. También es correcto que sólo son excluidas del ingreso bruto aquellas partidas que estén expresamente dispuestas en la ley de contribución sobre ingreso. No obstante, esto no es contradictorio con el principio que establece que las leyes que imponen contribuciones deben ser interpretadas de forma razonable, es decir, coherentes con el objetivo que persigue el legislador.

Es a esos efectos que hemos elaborado el análisis jurídico antes explicado que sirve para determinar si las indemnizaciones por despido que el patrono concede mediante un contrato de transacción son tributables. Dicho análisis consiste en establecer, primeramente, si esta indemnización constituye salario o puede clasificarse como una ganancia, beneficio o ingreso derivada de cualquier procedencia. De ser ello así, se debe examinar si el obrero que recibe la indemnización puede beneficiarse de una de las exclusiones o exenciones contributivas y, por esa razón no tiene que tributar por la indemnización recibida.

En numerosas ocasiones hemos reiterado que las indemnizaciones por despido injustificado no se consideran

salarios porque su finalidad no es compensar un trabajo realizado sino resarcir el daño que provoca el despido. Tal apreciación fue validada en la Ley de Contribuciones sobre Ingresos de 1994 cuando se eximió de los descuentos de nóminas a este tipo de compensación. Dicha consideración no aplica tan solo a la indemnización que se otorga cuando se determina judicialmente que el despido fue injustificado. También aplica a la compensación que recibe el obrero a través de un contrato de transacción bajo la Ley Núm. 80 de 1976, como sucedió en el presente caso. La razón para esto es que la presunción de que todo despido se considera injustificado, salvo que el patrono demuestre lo contrario, no se elimina por el mero hecho de haberse concedido la "mesada" mediante un contrato de transacción.

Sin embargo aunque no se trate de salario, debemos examinar si este tipo de pago constituye ingreso bruto producto de ganancia, beneficio o ingreso derivado de cualquier procedencia. Como vimos, en efecto, este tipo de indemnización resulta ser un beneficio para el obrero que se queda sin empleo y, por tanto, constituye ingreso bruto según lo define la sección 1022 del Código de Rentas Internas de 1994. No obstante, según vimos, toda indemnización recibida en un procedimiento judicial **o en transacción extrajudicial, por razón de lesiones personales** o enfermedad, queda excluida de tributación.

Los abarcadores y numerosos estudios a los que hemos hecho referencia demuestran que el despido es un daño que

repercute de forma integral en el aspecto moral y físico del obrero que se queda sin el medio para sustentar su vida y la de su familia. Por eso, no se pueden deslindar los efectos morales y físicos del despido, más bien, ambos están presentes como consecuencia el uno del otro. Por tanto, en función de la norma de exclusión adoptada por el Departamento de Hacienda, la indemnización que se obtiene como resultado del despido se excluye del ingreso bruto tributable.[112]

La indemnización por despido tiene la finalidad de asegurar que las personas que se quedan sin trabajo puedan sostenerse económicamente, complementando este apoyo económico con otros beneficios sociales otorgados a los obreros y sus familias. El dinero de "mesada" nunca será suficiente para equiparar los ingresos derivados del trabajo perdido y la seguridad social y estabilidad laboral que éste representaba. Entonces, sería inconsistente e injusto imponerle al obrero la obligación de tributar sobre dicha partida cuando ésta es insuficiente para todos los propósitos de sobrevivencia. En lugar de beneficiar al obrero, esta actuación tendría el efecto de penalizarlo porque como no se efectúa la retención en el origen de dicha partida, la tasa contributiva aumentará, en clara contradicción a la finalidad remediativa de la Ley Núm. 80 de 1976.

---

[112] El que la Asamblea Legislativa hubiese eximido al pago por despido de las deducciones de nóminas es consistente con esta conclusión y con el propósito que persigue la Ley Núm. 80 de 1976 de beneficiar a los empleados despedidos.

**IV.**

Por los fundamentos antes expresados, concluimos que la indemnización recibida por el señor Orsini García en este caso, en virtud del contrato de transacción bajo la Ley 80 suscrito con su patrono, no es tributable. Resolvemos que no es tributable la indemnización por despido que se activa como resultado de una responsabilidad patronal, sea contractual o legal, porque la finalidad de dicha indemnización es reparar el daño ocasionado al obrero por la pérdida de su empleo. Por consiguiente, se dictará sentencia confirmando la sentencia del Tribunal de Apelaciones.

Jueza Asociada
Liana Fiol Matta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Franciso J. Orsini García
          Recurrido

        v.                          AC-2007-100

Juan C. Méndez, Secretario de
Hacienda,     Estado     Libre
Asociado de Puerto Rico
          Peticionarios

*SENTENCIA*

En San Juan, Puerto Rico, a 18 de diciembre de 2009.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se confirma la sentencia del Tribunal de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre sin opinión escrita. El Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco concurren con opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Francisco J. Orsini García
          Recurrido

                    v.

                              AC-2007-100

Juan C. Méndez, Secretario de
Hacienda,    Estado    Libre
Asociado de Puerto Rico
          Peticionarios

          Opinión concurrente emitida por el Juez Asociado
          señor MARTÍNEZ TORRES

          En San Juan, Puerto Rico, a 18 de diciembre de 2009.

          La opinión que hoy emite este Tribunal resuelve que la compensación concedida por un patrono a un empleado como consecuencia de un acuerdo de transacción o relevo es una indemnización por despido injustificado para propósitos contributivos. La razón provista por este Tribunal para llegar a esa conclusión es que el despido que da lugar a ese acuerdo se presume ilegal o injustificado. No estoy de acuerdo con ese análisis.

          Según dispone la doctrina en materia evidenciaria, las presunciones son reglas dirigidas

al juzgador para hacer inferencias a partir de la evidencia presentada y admitida con miras a establecer los hechos en controversia. Véase, E. L. Chiesa Aponte, Tratado de Derecho Probatorio, Publicaciones JTS, 2005, Tomo II, p. 998. Una presunción es una deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho previamente establecido en una acción. El efecto de la presunción es que la parte contra la que se establece la presunción tiene el peso de la prueba para demostrar la inexistencia del hecho presumido. Chiesa Aponte, id.

A tales efectos, el renumerado Artículo 11 de la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185k, establece que en toda acción entablada por un empleado en la que se reclamen los beneficios de la ley por despido injustificado, el patrono tiene el peso de probar que la cesantía fue justificada. Como vemos, el legislador estableció una presunción que opera contra el patrono y que se activa con la presentación de una causa de acción bajo la Ley Núm. 80, id. Véase, Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364, 378 (2001). Como resultado de esta presunción, el patrono tiene el peso de probar la inexistencia del hecho presumido, esto es, que el despido fue ilegal o injustificado. En este caso, no está ante nuestra consideración una causa de acción judicial por despido injustificado en la que, por mandato de ley, se

activa una presunción de despido injustificado en contra del patrono demandado. Por tanto, no es correcto decir que el despido se presume injustificado. Ésta es una presunción estatutaria que sólo se activa en contra del patrono en una causa de acción en la cual se reclamen los beneficios de la Ley Núm. 80, id.

Ahora bien, el hecho de que no haya una presunción aplicable o una determinación judicial a los efectos de demostrar que ocurrió un despido injustificado no significa que la compensación como consecuencia de una transacción o relevo para evitar una reclamación bajo la Ley Núm. 80 no constituya una indemnización o pago de la mesada. El Artículo 9 de la referida ley, id., sec. 185i, establece que será nulo cualquier contrato, o parte del mismo, en que el empleado renuncie a la indemnización a que tiene derecho de acuerdo con la ley, por un despido injustificado. Conforme con lo anterior, para que un acuerdo de transacción o relevo de una causa de acción bajo la Ley Núm. 80 sea válido, éste debe cumplir con el pago total de la mesada a la que tendría derecho el empleado. En la medida que con el acuerdo de relevo se transigió cualquier potencial reclamación de mesada bajo la Ley Núm. 80 y que la compensación que se pagó es equivalente a la indemnización por despido injustificado a la que tendría derecho el empleado de prevalecer en un tribunal, entendemos que la compensación recibida es una indemnización ante la posibilidad de que se reclamare por

un despido ilegal o injustificado. Por esta razón, ya que no está claro que el empleado cesara en sus labores por liquidación o cierre de la empresa, concurro con la opinión mayoritaria en que el pago que un patrono le otorga a un empleado mediante un acuerdo de transacción que lo releva de una reclamación judicial bajo la Ley Núm. 80, goza del mismo tratamiento contributivo que la "mesada" que se paga como resultado de un juicio contencioso.

Cuando el empleado cesa por motivo de cierre o liquidación de la empresa, o por la justa causa enumerada en los incisos (d)(e) y (f) del Art. 2 de la Ley Núm. 80, id. sec. 185b(d)(e)(f), el Art. 10 de la misma ley, según enmendada por la Ley Núm. 278 de 15 de agosto de 2008, la compensación recibida estará libre del pago de impuestos. Art. 10 de la Ley Núm. 80, supra, sec. 185j. Ello no obstante, no surge claramente que esa sea la situación del empleado recurrido.

Aun así, concuerdo con el resultado al que llega este Tribunal al eximir del pago de contribuciones la indemnización que recibió el empleado por despido injustificado. Para la fecha que da lugar a la controversia ante nuestra consideración, la Sección 1022 (b)(5) del Código de Rentas Internas establecía que una **lesión personal** o enfermedad estaba exenta del pago de contribuciones. Bajo esta disposición, es razonable interpretar que el legislador incluyó las indemnizaciones

recibidas por concepto de cualquier tipo de lesión personal, ya sea por sufrimientos morales, angustias mentales o daños físicos. En ese sentido, la indemnización por despido injustificado estaba exenta del pago de contribuciones ya que la compensación se da para resarcir los sufrimientos morales y las angustias mentales que sufre el empleado como consecuencia de ser despido sin justa causa. No obstante lo anterior, entendemos que esta interpretación sólo aplica a las controversias contributivas que surjan a base de la sección 1022 (b) (5) del Código de Rentas Internas antes de la enmienda que sufrió esta sección en el año 2005. Veamos.

Mediante la Ley de la Justicia Contributiva del 2006, Ley Núm. 117 de 4 de julio de 2006, el legislador enmendó la Sección 1022 (b) (5) del Código de Rentas Internas, 13 L.P.R.A. sec. 8422(b)(5), para establecer que las compensaciones que se excluyen del ingreso bruto son aquéllas que se otorgan por motivo de "lesiones físicas personales" o "enfermedades físicas", ya sea que se obtengan por un procedimiento judicial o una transacción extrajudicial. Como vemos, con esta enmienda el legislador definió, expresamente, el tipo de lesión o enfermedad a la que se refiere esta sección. Con esta actuación legislativa se eliminó el término de "lesión personal" que abarcaba tanto los daños físicos como los daños morales o angustias mentales.

La interpretación restrictiva de las exenciones contributivas se fundamenta en que éstas son "gracias legislativas" o privilegios que el Estado concede, por lo que cualquier duda sobre su existencia debe resolverse en su contra. Véase, San Juan Trading Co. v. Srio. de Hacienda, 80 D. P.R. 807, 815 (1958). Por tanto, una exención contributiva debe existir concretamente, no puede inferirse. Id. Ahora bien, las exenciones contributivas no se interpretarán restrictivamente si la intención legislativa de concederlas es clara e inequívoca, pues se derrotaría entonces el propósito de la ley. Véase, entre otros, Roque González & Co. v. Srio. de Hacienda, 127 D.P.R. 842, 856-857 (1991). En atención a estas normas de hermenéutica entiendo que la enmienda legislativa hizo constar de forma clara e inequívoca que las compensaciones excluidas de tributación son aquéllas que se reciben por el tipo de daño especificado en el texto de la ley, a saber, lesiones físicas o enfermedades físicas.

La indemnización por despido injustificado no se otorga por motivo de la existencia de un daño físico o una enfermedad física. La mesada es una compensación que se otorga para resarcir el sufrimiento emocional y moral que provoca el ser despedido injustificadamente, como por ejemplo, la ansiedad por la pérdida del sustento y el daño a la autoestima. Puede ser que los daños morales y las angustias mentales que son objeto de la indemnización

por mesada puedan, en ocasiones, repercutir en las condiciones de salud física de los empleados. Sin embargo, esto no significa que la finalidad de la indemnización por despido injustificado es compensar una lesión física o una enfermedad física particular. Si resolvemos lo contrario estaríamos diciendo que cualquier compensación recibida como resultado de una acción torticera por daños morales y angustias mentales está exenta de tributar porque hay una posibilidad de que esos sufrimientos morales y emocionales causen a su vez daños físicos. Es decir, todas las indemnizaciones por lesiones personales estarían exentas de tributación. Esa no es la intención legislativa. Hay un mandato expreso de excluir de la tributación aquellas compensaciones que se reciban por motivo de lesiones físicas o enfermedades físicas.

Ello no obstante, como la enmienda a la Sec. 1022 (b) (5), <u>supra</u>, no tiene efectos retroactivos, el recurrido Francisco J. Orsini García no tiene que tributar por la cantidad que recibió de su patrono como indemnización al cesar en su empleo.

RAFAEL L. MARTÍNEZ TORRES
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Francisco J. Orsini García

      Recurrido

         v.

Juan C. Méndez, Secretario de Hacienda, Estado Libre Asociado de Puerto Rico     AC-2007-100

      Peticionarios

Opinión Concurrente emitida por la Jueza Asociada señora Pabón Charneco

San Juan, Puerto Rico a 18 de diciembre de 2009.

Concurro con la Opinión mayoritaria respecto a la determinación de que la indemnización condicionada a un Acuerdo de Relevo aceptada por el recurrido, Francisco J. Orsini García, no es tributable por tener como finalidad reparar el daño ocasionado a éste por la pérdida de su empleo. Empero, soy de opinión que la presunción estatutaria de que todo despido se presume injustificado no es el fundamento para que tal indemnización esté exenta de retención en el origen, sino que la misma está exenta por no constituir salario sujeto a retención según dispuesto en la Ley Núm. 120 de 31 de octubre de 1994, según

enmendada, conocida como "Código de Rentas Internas de Puerto Rico de 1994"[113]. Además, es mi contención que la presunción en cuestión solamente se activa en contra del patrono en una causa de acción en la cual se reclamen los beneficios de la Ley Núm. 80 de 30 de mayo de 1976.

I

Ciertamente las presunciones son reglas de inferencia dirigidas al juzgador y no son evidencia. E. Chiesa, *Tratado de Derecho Probatorio*, Publicaciones JTS, 1998, T. II, pág. 1087. Tienen como efecto modificar el peso de la prueba y la obligación de persuadir. *Id.*; pág. 1088.

En el ámbito laboral, el Artículo 8 de la Ley Núm. 80, *supra*, establece la presunción de despido sin justa causa al proveer, en lo pertinente, que:

> "En toda acción entablada por un empleado reclamando los beneficios dispuestos por las secs. 185a et seq. de este título, el patrono vendrá obligado a alegar, en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo justificado para quedar eximido de cumplir con lo establecido en la sec. 185a et seq. de este título".

Esta presunción ha sido estudiada por este Tribunal en distintas ocasiones y, al respecto, hemos expresado que ordena **"que en toda acción entablada por un empleado** reclamando los beneficios de mesada e indemnización progresiva por despido ilegal, el patrono vendrá obligado a alegar en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo

---

[113] 13 L.P.R.A. sec. 8541.

justificado para quedar eximido de satisfacer la indemnización". (Énfasis suplido) *Srio. del Trabajo v. I.T.T.*, 108 D.P.R. 536, 546 n.6 (1979). Por tanto, es mi contención que la presunción en cuestión solamente se activa en contra del patrono en una causa de acción en la cual se reclamen los beneficios de la Ley Núm. 80, *supra*; situación que no se presentó en el caso de autos.

No obstante, la indemnización condicionada a un Acuerdo de Relevo que incluye la suma requerida conforme a la fórmula establecida por la Ley Núm. 80, *supra*, satisface el derecho del empleado a la mesada – que podría tener éste de recaer sentencia a su favor en un proceso judicial – en cumplimiento de los objetivos de la Ley Núm. 80, *supra*, sólo que bajo la promesa de que el empleado no presente dicha controversia posteriormente.

## II

Por otro lado, la Ley Núm. 120, *supra,* obliga a los patronos a retener contribución en el origen del salario. Ésta define salario como "toda **remuneración por servicios prestados** por un empleado para su patrono, y toda remuneración en concepto de **pensión por servicios prestados**, incluyendo el valor en dinero de toda remuneración pagada por cualquier medio que no sea dinero…". (Énfasis suplido) 13 L.P.R.A. sec. 8541. A su vez, dicha sección excluye del término salario la

remuneración de ciertos servicios prestados.[114]    El referido listado de remuneraciones exentas incluye también aquella suma pagada "por concepto de indemnización en caso de despidos en que no haya mediado justa causa, según se dispone en las secs. 185a *et seq.* del Título 29, según enmendadas". 13 L.P.R.A. sec. 8541(a)(1)(G).

La Opinión mayoritaria apunta que la exención expresa respecto a la retención en el origen en la citada Ley Núm. 120 de las indemnizaciones pagadas a tenor con la Ley Núm. 80, *supra,* complementan y armonizan esta última ley. De esta forma se disipa cualquier duda de que éstas están exentas de descuento de nómina.

No obstante, al acudir a la definición del término "salario" dispuesto en la Ley Núm. 120, *supra*, la definición excluye por sí sola la indemnización por los daños sufridos por despido, sea contractual o legal, puesto que no podrá considerarse como una remuneración por servicios prestados ni sustituto del sueldo a efectos de retención en el origen.[115]

---

[114] "La remuneración por servicios prestados por un empleado a su patrono no constituye salarios para los fines de la retención si la misma está específicamente excluida como salarios bajo cualesquiera de los incisos bajo la Sección 1141(a)(1) del Código. La remuneración así excluida no constituye salarios para los fines de la retención, aunque la misma se pague por servicios prestados en Puerto Rico, promulgado al amparo de la Sección 6130 del Código que faculta al Secretario de Hacienda a adoptar los Reglamentos necesarios para poner en vigor dicho Código". Reglamento para implantar las disposiciones de la Sección 1141 de la Ley Núm. 120 de 31 de octubre de 1994, según enmendada, conocida como "Código de Rentas Internas". Reglamento Núm. 6248, Departamento de Estado, 22 de diciembre de 2000, págs. 7 y 8.

[115] Puesto que las tres modalidades indemnizatorias del despido discutidas en la Opinión mayoritaria tienen la misma finalidad de reparar el daño provocado por la pérdida del empleo, cabe por tanto el mismo razonamiento aplicado en *Alvira Cintrón v. S.K. & F. Laboratories Co.*, 142 D.P.R. 803 (1997). En dicho caso expresamos

Respecto a los fundamentos por los que las indemnizaciones por despido – producto de una reclamación judicial o de una transacción extrajudicial – están exentas del pago de contribuciones, concordamos enteramente con lo determinado en la Opinión mayoritaria.

II

Por los argumentos antes expresados, concurro con el resultado de la Opinión mayoritaria en el caso de autos.


                              Mildred G. Pabón Charneco
                                   Jueza Asociada

---

que una indemnización por daños causados por un despido injustificado no está sujeta a descuento de nómina alguno, ya que no equivale una remuneración o salarios por servicios prestados ni constituye un sustituto del sueldo.